**Jacqueline BENHAM, Plaintiff,**

v.

**LENOX SAVINGS BANK, Defendant.**

**No. CIV.A. 98–30004–MAP.**

United States District Court,
D. Massachusetts.

Oct. 13, 1998.

Richard J. O'Brien, Daniel R. Solin, Pittsfield, MA, for Jacqueline T. Benham, Plaintiff.

James E. Wallace, Jr., Thomas J. Scannell, Bowditch & Dewey, Worcester, MA, for Lenox Savings Bank, Defendant.

### ORDER

PONSOR, District Judge.

Upon *de novo* review, this Report and Recommendation is adopted; plaintiff's motion is hereby denied.

*REPORT AND RECOMMENDATION REGARDING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Docket No. 10)*

August 25, 1998.

NEIMAN, United States Magistrate Judge.

In her motion for partial summary judgment, Jacqueline T. Benham ("Plaintiff") asserts that Lenox Savings Bank ("Defendant") committed various violations of the Employee Retirement income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). In addition, Plaintiff claims that Defendant fraudulently induced her to enter into a settlement agreement on July 13, 1995, which had the effect of reducing her benefits under a deferred compensation plan. Plaintiff, in her motion for partial summary judgment, seeks a declaratory judgment entitling her to full plan benefits and reasonable attorneys fees incurred in obtaining this relief.

Plaintiff's motion has been referred to the court for a report and recommendation pursuant to Rule 3 of the Rules for United States Magistrates of the United States District Court for the District of Massachusetts. *See* 28 U.S.C. § 636(b)(1)(B). For the reasons stated below, the court recommends that Plaintiff's motion be denied.

### I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the record reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The facts must be viewed in a light most favorable to the non-moving party. *Santiago–Ramirez v. Secretary of Dep't of Defense of United States,* 62 F.3d 445, 446 (1st Cir.1995). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.,* 18 F.3d, 13, 15 (1st Cir.1994) (discussing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The factual dispute claimed by the non-moving party must be "material" and the dispute over it "genuine." A "genuine" issue is one that only a finder of fact can properly resolve because it may reasonably be resolved in favor of either party and a "material" issue is one that affects the outcome of the suit. *Aponte Matos v. Toledo Davila,* 135 F.3d 182, 186 (1st Cir.1998); *Collins v. Martella,* 17 F.3d 1, 3 n. 3 (1st Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Mere allegations or conjecture unsupported in the record are insufficient to raise a genuine issue of material fact. *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 5 (1st Cir.1998). Absent a genuine dispute of material fact, questions of law are appropriate for resolution on summary judgment. *Jimenez v. Peninsular & Oriental Steam Nav. Co.,* 974 F.2d 221, 223 (1st Cir.1992).

## II. *FACTS*

The court will not repeat the entire history of the deferred compensation plan at issue here, that history having been memorialized in *Lemanski v. Lenox Savings Bank,* No. Civ.A. 95–30074–MAP, 1996 WL 253315, at *1 (D.Mass. April 12, 1996). Only facts relevant to the instant motion are presented. Given that this is Plaintiff's motion, the facts, although mainly undisputed, are presented in a light most favorable to Defendant.

Defendant is located in Lenox, Massachusetts, and has a management structure composed of both a Board of Trustees ("BOT") and a Board of Investment ("BOI"). Early in 1986, Stanley T. Ryba ("Ryba"), then President of the Bank, adopted a deferred compensation plan, known as the Brick Plan, covering its key executive officers. The Brick Plan was offered through an entity known as the Ban Ser Corp. While Ryba informally discussed the Brick Plan with members of the BOI as early as March of 1986, he did not do so as part of a formal BOI meeting because he did not think that the Plan was likely to cost Defendant any money.

In order to qualify for benefits under the Brick Plan, each participant was to continue as an employee of Defendant for up to five years after execution of his or her participation agreement, during which time a portion of his or her salary would be deferred. Defendant would thereafter pay income to the participant for ten years beginning at age sixty-five or, in the event of a premature death, to a named beneficiary.

"Deferred Income Agreements" concerning Defendant's various officers and Trustees, including Plaintiff as Vice President, were entered into on July 1, 1988. Plaintiff's agreement was signed by her and by Ryba on behalf of Defendant. The agreement stated (i) that Defendant would pay Plaintiff a total of $273,870 in monthly installments of $2,282.25 starting at age sixty-five for a ten year period, (ii) that, in consideration thereof, Plaintiff agreed to continue to serve Defendant as an employee for five years, (iii) that Plaintiff's benefits would vest monthly over a five year period, and (iv) that once Plaintiff served five consecutive years as an officer of Defendant her benefits would fully vest. The agreement also provided for certain death benefits to be paid to Plaintiff's beneficiary. Plaintiff thereafter deferred $3,000 of her income for each of the five years required by the Brick Plan and continued in the employ of Defendant for several years in excess of the time required for her benefits to fully vest.

In 1989, Ryba learned from Defendant's bank auditors that there would be certain costs under the Brick Plan and decided to seek approval of the plan from the BOI. At a February 22, 1989 meeting, the BOI formally voted to offer the Brick Plan to certain officers. On March 13, 1989, the BOT voted to ratify the BOI's actions but did not specifically discuss the Brick Plan.

In February of 1993, Michael A. Christopher ("Christopher") succeeded Ryba as Defendant's president. Christopher has testified that, shortly thereafter, he read Defendant's corporate bylaws and learned of the existence of the Brick Plan. One year later, in February of 1994, Christopher learned that a larger than normal reserve would have to be taken on the bank's 1993 financial statements due principally to amendments allowing for early retirement of some Brick Plan participants. Christopher then reviewed the bank's adoption of the Brick Plan. After consulting bank counsel, Christopher concluded and so advised the BOT that the plan had not been properly adopted.

Thereafter, Christopher advised participants, including Plaintiff, that the Brick Plan had been improperly adopted and proposed alternative benefits. Executive Vice President Wayne Lemanski ("Lemanski") rejected the proposal and, in May of 1994, brought suit against Defendant to enforce his benefits under the plan.

While Lemanski's case was pending, Christopher made a specific written proposal in a letter dated June 22, 1995, to the other Brick Plan participants, including Plaintiff. In introductory paragraphs, Christopher stated the following:

> As you know, the Bank has taken the position that the "Brick Plan" "contracts,"

as to which you are a participant, were not timely or properly authorized by the Board of Trustees of the Bank as required by the Bank's bylaws. One of the participants has instituted a civil action seeking a declaration that the "Brick Plan" is valid and enforceable as to him, and that action is presently pending in the United States District Court for the District of Massachusetts.

If, as the Bank believes, it prevails in the present litigation, there will have been a judicial determination that the Brick Plan is void and unenforceable. If such a determination is made, "Brick Plan" benefits may be unenforceable as to all participants.

(Pl. Statement of Undisputed Facts (Docket 13), Exhibit C.) Then, recognizing that Plaintiff, as well as other plan participants, may have made retirement and investment plans based on the expectation of Brick Plan benefits and "to mitigate the effect of a negative ruling," Christopher offered Plaintiff the option of electing to receive seventy percent of the benefits which would otherwise be payable pursuant to the terms of the plan. (Id.) The same offer was made to all but two of the participants, one of whom was receiving nominal payments under the plan, the other the widow of a participant who was already receiving benefits. Acceptance of the offer was conditioned upon Plaintiff's acknowledgment that the Brick Plan was "void" and "unenforceable" and her agreement to "waive any and all claims or demands ... she may have against Defendant, its President or former officers, Trustees, and agents in connection with the Plan." (Id.) The letter encouraged Plaintiff to have the proposed Settlement Agreement reviewed by her legal counsel or other advisors. The letter concluded as follows:

1. In a separate motion, Plaintiff has sought to strike certain statements from Christopher's affidavit submitted in support of Defendant's opposition to Plaintiff's motion. Plaintiff contends that Christopher's statements about the bank's counsel's advice regarding the *Lemanski* case have no basis in personal knowledge and, thus, are hearsay. The court has denied Plaintiff's motion. Plaintiff's affidavit is reflective of Christopher's state of mind when he made certain statements

If you timely accept the Bank's proposal, payments will be made to you even if the Bank successfully defends the present litigation. If you elect not to sign the enclosed Agreement, then it is probable that (i) if [Lemanski] is successful in his claim, you will receive all of the benefits otherwise afforded to you under your existing "Brick Plan" arrangement and (ii) if [Lemanski] is not successful, the Bank will reimburse you for the amounts withheld from your compensation but will not otherwise be obligated to honor the existing "Brick Plan" arrangement.

(Id.) [1]

On July 13, 1995, Plaintiff signed the Settlement Agreement which had been offered in the June 22, 1995 letter. Plaintiff thereby agreed to a reduction in her Brick Plan benefits and acknowledged that the adoption of the plan was "void and unenforceable." All the other Brick Plan participants, with the exception of Lemanski and the two participants whose benefits were paid at one hundred percent of value, executed similar agreements.

## III. *DISCUSSION*

In her motion, Plaintiff seeks partial summary judgment on Counts IV, V and VI of her complaint. In Count IV, Plaintiff contends that Defendant induced her to enter into the Settlement Agreement by making false and fraudulent misrepresentations. In Count V, Plaintiff asserts that Defendant illegally modified the terms of the Brick Plan in violation of ERISA. In Count VI, Plaintiff argues that Defendant wrongfully discriminated amongst plan participants by offering different benefit packages. The remaining counts in Plaintiff's complaint are unrelated to the Brick Plan.

to Plaintiff regarding both the Brick Plan and the Settlement Agreement and are relevant to Plaintiff's claim of misrepresentation. In any case, the court relies mainly on Christopher's representations as set forth in his letter of June 22, 1995, portions of which are quoted above and to which there has been no opposition by Plaintiff. Indeed, Plaintiff relies almost exclusively on that same letter to support her summary judgment motion.

## A. Collateral Estoppel

As a preliminary matter, Plaintiff argues in her supporting memoranda that Defendant is precluded from relitigating the issues previously adjudicated in Lemanski's lawsuit. Such offensive collateral estoppel would estop Defendant from litigating issues that it "previously litigated unsuccessfully" against Lemanski. *See Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326 n. 4, 329, 99 S.Ct. 645, 58 L.Ed.2d 552. (1979). *See also Kyricopoulos v. Town of Orleans,* 967 F.2d 14, 16 (1st Cir.1992) ("Massachusetts no longer requires mutuality of parties to invoke issue preclusion"). Most particularly, Plaintiff maintains that the court has already determined that the Brick Plan was properly adopted.

In response, Defendant argues that the doctrine of collateral estoppel is inapplicable because *Lemanski* involved several different matters than are at issue here. *See St. Paul Fire & Marine Ins. Co. v. Weiner,* 606 F.2d 864, 868 (9th Cir.1979) (issues resolved in the past action have to be identical to those in the present action). Most particularly, Defendant contends that the issue in *Lemanski* was whether the BOT, in accepting the BOI's vote, ratified the Brick Plan as it pertained to certain officers. Here, Defendant argues, an issue of fact remains as to whether this vote applied to Plaintiff because she was not among those officers named.

Despite his original invocation of collateral estoppel, Plaintiff's counsel acknowledged at oral argument that questions regarding the formal adoption of the Brick Plan, and hence the question of collateral estoppel, need not be resolved for purposes of the current motion. The court agrees. Indeed, it appears that the proper adoption of the Brick Plan is assumed by both parties for purposes of the court's analysis of Plaintiff's remaining claims.

## B. Count IV

■ In Count IV, Plaintiff alleges that Defendant induced her to accept the Settlement Agreement through a number of false and fraudulent misrepresentations. Fraudulent misrepresentation occurs when a defendant (1) makes a false misrepresentation of material fact, (2) has knowledge of that falsity and (3) has the purpose of inducing a plaintiff to act, and the plaintiff (4) relies upon the representation as true and (5) acts to her detriment. *Roadmaster Indus. v. Columbia Mfg. Co., Inc.* 893 F.Supp. 1162 (D.Mass.1995). Here, Plaintiff contends that Defendant, through Christopher, made false and fraudulent statements in the June 22, 1995 letter. Specifically, Plaintiff contends that Christopher failed to fully disclose information Defendant had at hand with respect to the viability of the Brick Plan and misrepresented the likelihood that Defendant would prevail in the pending *Lemanski* case.

■ In response, Defendant maintains that Christopher did not make a fraudulent misrepresentation because, in his letter of June 22, 1995, Christopher was merely expressing an opinion as to the outcome of pending litigation. Indeed, there can be no liability for misrepresentation when a statement concerns a matter of opinion, estimate or judgment. *See Logan Equip. Corp., v. Simon Aerials, Inc.,* 736 F.Supp. 1188, 1199 (D.Mass.1990) (citing *Snyder v. Sperry & Hutchinson Co.,* 368 Mass. 433, 333 N.E.2d 421, 428 (1975)). *See also Roadmaster,* 893 F.Supp. at 1162. When a future event is not substantially within the defendant's control, a defendant's statement about a future event cannot be a misrepresentation. *See Yerid v. Mason,* 341 Mass. 527, 170 N.E.2d 718 (1960).

Nevertheless, Plaintiff argues that certain facts, as later determined by the court in *Lemanski,* suggest that Christopher had no valid basis for his statements. Plaintiff claims that when Christopher wrote the June 22, 1995 letter, in which he expressed his belief that Defendant would prevail in the Lemanski litigation and that the Brick Plan was "not timely or properly authorized" by the BOT, he was aware of five facts in particular which made his representations fraudulent. These facts, culled from this court's report and recommendation of March 13, 1996, later adopted, are as follows:

1. On March 13, 1989, the Board of Trustees ratified the actions of the Board of Investment including the actions taken

on February 22, 1989 when the Brick Plan was adopted by the Board of Investment. The Trustees had in their hands a variety of documents which alerted them to the adoption of the Deferred Compensation Plan including, minutes of the Board of Investment and financial statements demonstrating payments made pursuant to the terms of the Brick Plan, and a report from Kirby dated March 13, 1989 indicated that certain members of the Board of Investment had elected to defer all or a portion of their compensation;

2. Every year Bank management gave the auditors a representation letter which stated that they had fairly represented matters contained in the financial statements to the auditors and the auditors notes reflect that they reviewed the March, 1989 Financial Statements with the audit committee which then discussed them with the full board of Trustees;

3. Twenty-four reports from March, 1987 through December, 1993 were distributed by Kirby to Trustees and Board of Trustees' meetings. Those reports indicate that certain Trustees chose to defer all or a portion of their compensation for that particular quarter;

4. $116,040.81 in payments were made pursuant to the Brick Plan from December, 1988 through June, 1995;

5. Shortly after he became President, Christopher himself signed an Amendment to Kirby's June 1, 1986 Brick Plan Agreement.

(Pl. Mem. (Docket No. 11) at 5.)

Having carefully reviewed the June 22, 1995 letter, upon which Plaintiff pins her arguments, the court does not agree that the statements therein rise to the level of misrepresentation, at least as a matter of law, for purposes of Plaintiff's summary judgment motion. First, at the time Christopher's statements were made on June 22, 1995, there were disputed facts outstanding before the court. The resolution of those facts did not come until the court's report and recommendation was adopted nearly a year later. Second, it appears that Christopher was merely asserting his opinion, estimate or judgment, not misrepresenting specific facts

about the litigation itself. With hindsight, Plaintiff argues that the letter was fraudulent on its face based upon the court's subsequent findings of fact. However, Plaintiff's claim of fraud requires proof of a specific state of mind, among other elements. Even given the court's findings in *Lemanski*, Plaintiff is a long way from entitlement to summary judgment on such a fact intensive matter.

■ Misrepresentation occurs when "the representation was false and was susceptible of actual knowledge." *Roadmaster*, 893 F.Supp. at 1176. In *Roadmaster*, the defendants were attempting to sell a manufacturing facility to the plaintiffs and made certain representations regarding the environmental condition of the site. The court found that the representations made by defendants were susceptible of actual knowledge because, at the time of the agreement, they knew of the site's history of hazardous contamination in violation of federal and state laws and the EPA's ongoing investigation. Accordingly, the defendants were on notice that the environmental conditions were more serious than they represented.

In contrast, Christopher's representations in the case at bar were all clearly conditional and dependent upon future events. In his letter, Christopher explained Defendant's "position" with respect to the viability of the Brick Plan and informed Plaintiff that a co-participant had instituted a civil action seeking a declaration regarding the enforceability of the plan as to him. (Pl. Statement of Undisputed Facts, Exhibit C.) Christopher also explained that, "*If*, as the Bank believes, it prevails in the present litigation, there will have been a judicial determination that the Brick Plan is void and unenforceable." (Id. (emphasis added).) Christopher then explained that, "*If* such a determination is made, 'Brick Plan' benefits *may* be enforceable as to all participants." (Id. (emphasis added).) Christopher also explained the options with respect to Defendant's proposal of settlement. Again the explanation was couched in conditional language. Finally, Christopher encouraged Plaintiff to have the proposal reviewed by her legal counsel.

Taken together, Christopher's letter hardly amounts to fraud as a matter of law. In fact, in her own affidavit, Plaintiff characterizes the June 22, 1995 letter as Christopher's expressing his "belief" that the Bank would prevail in the Lemanski litigation and that the Brick Plan would be deemed void. (Pl. Aff. (Docket No 12) ¶ 2.) "I could not afford to take this risk," Plaintiff avows, (id.¶ 3), accurately recognizing that it was a risk she needed to calculate at the time. Now, Plaintiff impliedly claims, had she known the additional facts explicated above, the odds would have been better and she may have evaluated the risk differently. Of course, in his letter of June 22, 1995, Christopher had not guaranteed "success" to Plaintiff, for even if Lemanski were to prevail, it was only "probable," not certain, that she would receive one hundred percent of her Brick Plan benefits. (Pl. Statement of Undisputed Facts, Exh. C.)

In sum, the Court agrees with Defendant that, at bottom, there are genuine issues of fact regarding Defendant's representations and Plaintiff's execution of the Settlement Agreement, which issues preclude summary judgment on Count IV.

## C. Count V

■ Addressing Count V, Plaintiff argues that Defendant lacked the authority to modify the Brick Plan. Again, based upon *Lemanski*, Plaintiff argues that, in failing to reserve the right to terminate the Brick Plan, Defendant lacked the authority to contractually revoke or modify the plan. Plaintiff also argues that ERISA-based pension plans are unilateral contracts that create vested rights when an employee accepts the employer's offer through performance. As a unilateral contract, Plaintiff asserts, the Brick Plan could not be modified or amended by the Settlement Agreement. *See Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 287 (3d Cir.1995).

Whereas Plaintiff's arguments are grounded in ERISA, Defendant maintains that the Brick Plan is exempt from most of ERISA's regulatory provisions. Being a so-called "top hat" plan, Defendant maintains, the Brick Plan instead is subject to federal common law contract principles. *Id. See also Ferris*

*v. Marriott Family Restaurants, Inc.*, 878 F.Supp. 273 (D.Mass.1994) (rights and benefits regarding plans of certain highly compensated managers, unlike most ERISA plans, may be waived or assigned). Under these principles, Defendant asserts, a negotiated modification of the Brick Plan, if supported by consideration, is enforceable.

■ Both parties agree, and the court finds, that the Brick Plan was indeed a top hat plan offered to certain highly compensated employees as a vehicle for deferring compensation and taxation. In general, such plans are not subject to most ERISA regulations:

> Congress imposed strict regulations over plans whose participants and beneficiaries it most desired to protect—employer-funded plans designed to secure employees' financial security upon retirement. ERISA imposes upon the trustees and sponsors of such plans strict fiduciary duties and standards of care and further provides for detailed disclosure and vesting requirements. Top hat plans, however, which benefit only highly compensated executives, and largely exist as devices to defer taxes, do not require such scrutiny and are exempted from most of ERISA's regulatory scheme. In particular, top hat plans are not subject to certain vesting, participation, and fiduciary requirements.

*Kemmerer*, 70 F.3d at 286–87. *See* 29 U.S.C. § 1101(a)(1) (exempting top hat plans from fiduciary responsibilities); 29 U.S.C. § 1051(2) (exempting top hat plans from participation in vesting requirements); 29 U.S.C. § 1081(a)(3) (exempting top hat plans from minimum funding standards). Still, Defendant concedes that "ERISA's enforcement provision clearly permits participants in top hat plans, as well as other covered plans, to bring civil actions to enforce the substantive provisions of the Act or to recover benefits due or otherwise enforce the terms of the plan." *Kemmerer*, 70 F.3d at 286–87.

■ Top hat plans are unilateral contracts and, thus, are governed by contract principles. *See Kemmerer*, 70 F.3d at 287; *Spacek v. Maritime Assoc.*, 134 F.3d 283 (5th Cir.1998) (discussing the Tenth and Third

Circuits' reasoning that a top hat plan is a unilateral contract); *Amatuzio v. Gandalf Sys. Corp.*, 994 F.Supp. 253 (D.N.J.1998) (discussing the Third Circuit's recognition of "Top Hat plans as unilateral contracts in cases where plan participants allege that their employer breached such contracts"). A unilateral contract is formed when an employee accepts the employer's offer by performing the requisite number of years of performance. *See Kemmerer*, 70 F.3d at 287. Under the Brick Plan, Plaintiff accepted the offer, remained employed in excess of five years and deferred $15,000 of her salary over the initial five year period.

■ Once Plaintiff's performance was completed and her rights vested, Defendant could not unilaterally modify the contract. *Id. See also Pratt v. Petroleum Prod. Management, Inc. Employee Sav. Plan & Trust*, 920 F.2d 651, 661 (10th Cir.1990) ("Subsequent unilateral adoption of an amendment which is then used to defeat or diminish the plaintiff's fully vested rights under the governing plan documents is not only ineffective, but also arbitrary and capricious."). Here, however, it does not appear, again for summary judgment purposes, that Defendant made a unilateral amendment. Rather, Defendant negotiated with Plaintiff and entered into the bilateral Settlement Agreement for which there appears to have been consideration. In essence, Plaintiff accepted the settlement proposal as the alternative to risking the loss of all her benefits. *See Estate of Kokernot*, 112 F.3d 1290, 1294 (5th Cir.1997) (a settlement agreement is a contract and mutual forbearance supplies the consideration).

■ Furthermore, the Brick Plan itself provided that "[t]his agreement may be amended only by a written Agreement signed by the parties." This provision clearly enabled the parties to amend the original plan, as they ultimately did through their Settlement Agreement. As the *Kemmerer* court recognized, a top hat contract could be terminated if "an explicit right to terminate or amend after the participants performance is reserved." *See Id.* at 287–88. That type of reservation was explicit in the Brick Plan. Pursuant to that provision, the parties mutually entered into their Settlement Agreement. As *Kemmerer* explains, "Congress exempted top hat plans from ERISA's [ ] requirements in large part because it recognized that high level executives retain sufficient bargaining power to negotiate particular terms and rights under the plan and therefore do not need ERISA's substantive rights and protections … This being so, it would be absurd to deny such individuals the ability to enforce the terms of the contract …" *Id.* at 288.

It may well be that the Settlement Agreement was not so much an amendment to the Brick Plan as it was a substituted contract. Even so, summary judgment is precluded. The Restatement of Contracts allows for a substituted contract which "is itself accepted by the obligee in satisfaction of the obligor's existing duty." Restatement (Second) of Contracts § 278 (1981). The substituted contract discharges the original duty. *Id.* Here, Christopher's offer, which Plaintiff apparently accepted, had the effect of releasing Defendant from its duties under the original plan. In fact, Plaintiff's acceptance of Christopher's offer was conditioned specifically upon her acknowledging that the Brick Plan Agreement was "void" and "unenforceable" and that she agreed to "waive any and all claims or demands … she may have against the Bank, its President or former officers, Trustees, and agents in connection with the Plan." Thus, questions of fraudulent inducement aside, Plaintiff's execution of the Settlement Agreement meant that the Brick Plan was no longer the source of her rights.

At bottom, there appears to be no statutory or contractual bar to the parties entering into their Settlement Agreement. On that basis alone, Plaintiff would not be entitled to summary judgment with respect to Count V. To the extent Plaintiff claims that Defendant engaged in fraudulent misrepresentations prior to the execution of the Settlement Agreement, however, there is a genuine issue of material fact. That too would preclude summary judgment on Count V.

**D. *Count VI***

■ Finally, Plaintiff seeks summary judgment with respect to Count VI, namely,

Plaintiff's claim that Defendant wrongfully discriminated among plan participants in violation of ERISA. In essence, Plaintiff asserts, Defendant wrongfully decided that two plan participants could receive full plan benefits, while those who accepted the Settlement Agreement were afforded only seventy percent of their anticipated benefits.

ERISA prohibits retaliatory discrimination against an employee based upon her exercise of rights. Specifically, ERISA provides that "It shall be unlawful for any person to ... discriminate against a participant or beneficiary for exercise any right to which he is entitled to under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ..." 29 U.S.C. § 1140.

Defendant questions, as does the court, whether the ERISA anti-discrimination provision is even applicable to a top hat plan such as the Brick Plan. *See Kemmerer*, 70 F.3d 281 ("Top hat plans ... are exempted from much of ERISA's regulatory scheme ... In particular, top hat plans are not subject to certain vesting, participation, and fiduciary requirements"). Yet even if the ERISA anti-discrimination provision were applicable, it is doubtful that Defendant could be found to have discriminated against Plaintiff as a matter of law.

Again, Plaintiff appears to have voluntarily entered into an agreement with Defendant to reduce the amount of her benefits, knowing that two Brick Plan participants would be receiving "full" benefits. Given the circumstances, there is no substantiation that any discrimination occurred. It would therefore be inappropriate to grant Plaintiff summary judgment on Count VI.

### IV. CONCLUSION

For all the reasons described, the court recommends that Plaintiff's motion for partial summary judgment be DENIED.[2]

August 25, 1998.

---

**2.** The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of

Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart v. Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.