

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-17-1995

# Kemmerer v ICI Americas Inc.

Precedential or Non-Precedential:

Docket 95-1071

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Kemmerer v ICI Americas Inc." (1995). *1995 Decisions.* Paper 292.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/292

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

JOHN L. KEMMERER; JAMES H. JORDAN,

                          Appellants in No. 95-1071

          v.

ICI AMERICAS INC.


JOHN L. KEMMERER; JAMES H. JORDAN

          v.

ICI AMERICAS INC.,

                          Appellant in No. 95-1098
          _____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 92-5986)
_____

Argued October 11, 1995

BEFORE:  GREENBERG, LEWIS, and ROSENN, <u>Circuit</u> <u>Judges</u>

(Filed: November 17, 1995)
_____

                    Theodore R. Mann (argued)
                    Carol J. Sulcoski
                    Sharon C. Weinman
                    Mann, Ungar & Spector, P.A.
                    1709 Spruce Street
                    Philadelphia, PA  19103

                    <u>Attorneys for</u>
                    <u>John L. Kemmerer</u>
                    and John H. Jordan


                    Michael L. Banks (argued)

1

                              Morgan, Lewis & Bockius
                              2000 One Logan Square
                              Philadelphia, PA  19103
                                   Attorneys for
                                   ICI Americas Inc.

_____

**OPINION OF THE COURT**
_____


GREENBERG, Circuit Judge.


        In this case, arising under the Employee Retirement
Income Security Act (ERISA), the district court held that the
defendant company breached the terms of the executive deferred
compensation plan that it offered to its highly compensated
employees.  Yet it also held that the appellants -- participants
in that plan -- failed to prove they suffered any damages as a
result of the breach.  We hold that the district court correctly
decided both issues and therefore we will affirm its judgments.


## I.  Introduction

        Appellants John L. Kemmerer and James H. Jordan were
high level executives of the defendant, ICI Americas Inc.[0]  ICI
offered its employees the opportunity to participate in a number
of benefit plans.  The dispute on appeal centers around its
executive deferred compensation plan (the DEC plan), which like

_____

[0]ICI Americas Inc. explains in its brief that it has changed its
name to Zeneca Inc. and that the company now known as ICI
Americas Inc. is an entirely different corporation which came
into existence as a result of a reorganization of the business
that began in late 1992.  Nevertheless, as a matter of
convenience, we refer to the defendant as ICI.

all such plans is commonly referred to as a "top hat" plan. Specifically, ICI encouraged its high level executives to participate in the DEC plan, under which participants deferred receipt of a percentage of their income, and thus initially reduced their annual taxable income. Although the DEC plan was unfunded, its participants were allowed to track or shadow investment portfolios available to participants of an ICI deferred contribution plan. ICI would credit the participants' balances in the DEC plan as though the hypothetical investments actually had been made. Appellants participated in the DEC plan.

An executive's account balance in the DEC plan became payable after the executive left ICI's employ. The DEC plan permitted participants to elect the method of payment by which distributions would be made. In this regard, the plan was amended on February 1, 1985, to state:

> Amounts deferred under this agreement shall be paid to Optionee commencing January 15 of the year following the year of his separation from service in five percentage installments . . . unless, prior to separation from service the Optionee files a written notice with the Secretary of Company, ('Secretary') requesting a different form of distribution. Such notice shall be treated as an election by the Optionee to receive payment by the method requested. The method of distribution requested shall be irrevocable after the close of business on the date of Optionee's separation from service.

Kemmerer v. ICI Americas, Inc., 842 F. Supp. 138, 139–40 (E.D. Pa. 1994).[0] Pursuant to this provision, "Jordan elected to have

---

[0]We simplify our discussion of ICI's plans to encompass only what is relevant on appeal. The district court's opinion discusses

3

his DEC benefits paid in specific annual amounts until the year 2007. Kemmerer elected to have his plan balance distributed in fixed annual amounts until such time as his account balance would be exhausted." Id. at 140. After Kemmerer and Jordan retired (in 1986 and 1989 respectively), ICI began distributing their benefits in accordance with their respective elections. In 1991, however, ICI unilaterally decided to terminate the DEC plan. At that point, rather than complying with its retired executives' elections, ICI decided to distribute their accumulated account balances in three annual installments, with 10% interest on the unpaid balances, to be paid in January 1992, January 1993, and January 1994. ICI advised appellants of this change by letters dated November 29, 1991.

On October 16, 1992, after ICI made one payment on the new distribution schedule, appellants filed this action in the district court contending that, by terminating the DEC plan after their rights in it had vested, ICI breached its contractual obligations and thereby violated ERISA. They requested monetary damages for the benefits lost as a consequence of ICI's breach of the plan. In this litigation, they contend that the early termination of the plan had adverse tax consequences to them and required them to incur fees for financial management they otherwise would not have incurred. They do not contend, however, that ICI did not pay them the full amount of their account balances. Consequently, they are in the position, unusual if not

the various plans in greater detail. See Kemmerer, 842 F. Supp. at 139-40.

4

unprecedented for plaintiffs, of suing for damages because they were paid money owed to them. Eventually appellants and ICI filed cross-motions for summary judgment on liability, and ICI filed a motion for summary judgment on damages. In an opinion filed on January 4, 1994, reported at 842 F. Supp. 138, the district court granted appellants' motion for summary judgment on liability, and denied ICI's motions on both liability and damages. The court entered an order on January 5, 1994, in accordance with its opinion.

The district court held a nonjury damages trial in October 1994. In an unreported memorandum opinion filed on December 22, 1994, the court rejected appellants' argument that ICI had the burden of proof and held that appellants had failed to prove that they suffered damages as a result of ICI's conduct. Accordingly, it entered a judgment in favor of ICI on December 23, 1994. On January 19, 1995, the parties stipulated, and the court ordered, that all claims except those for attorneys' fees and costs had been resolved. The court stayed proceedings as to those items pending the completion of this appeal. Both parties then filed appeals, appellants from the order of December 23, 1994, and ICI from the order of January 5, 1994.

Arguably, we should dismiss ICI's appeal, as ICI could challenge the district court's finding of liability in this court as an alternative ground for us to affirm. See Armotek Indus., Inc. v. Employers Ins. of Wausau, 952 F.2d 756, 759 n.3 (3d Cir. 1991). But we will not do so because appellants have filed a fee petition which, as we have indicated, the district court has

5

stayed pending disposition of this appeal.  Thus, even though we

affirm on the damages issue, ICI may be aggrieved by the judgment

on liability, because the district court may conclude that, on

the basis of that judgment alone, it can award the appellants

counsel fees.[0]  Of course, we express no opinion on this point.

However, in view of ICI's success at trial on the damages issue,

its appeal from the denial of its motion for summary judgment on

damages is moot and we will not consider it.  See McDaniels v.

Flick, 59 F.3d 446, 448 n.1 (3d Cir. 1995).  We have jurisdiction

over appellants' appeal pursuant to 28 U.S.C. § 1291.  The

district court exercised diversity of citizenship and federal

question jurisdiction under 28 U.S.C. § 1332(a) and 29 U.S.C.

§1132(e).


## II.  Discussion

### A.  Liability

We first consider whether the district court erred in

concluding that ICI breached the terms of the DEC plan.  We

exercise plenary review on this issue as the district court

granted the appellants' motion for summary judgment.  See

---

[0]In theory, we could conclude that until such time as the
district court enters an award of fees against ICI, if it does
so, ICI has not been aggrieved by the liability judgment and that
we therefore should dismiss its appeal.  However, we will not
take that approach, as the liability issue has been briefed fully
and, in any event, we can consider ICI's challenge on that issue
as an alternative basis to affirm.  Furthermore, we think that
resolution of the liability issue at this time may aid in
concluding this case.  Of course, there is no doubt but that we
have the power to consider the issue.  See United States v. Tabor
Court Realty Corp., 943 F.2d 335, 342-44 (3d Cir. 1991), cert.
denied, 502 U.S. 1093, 112 S.Ct. 1167 (1992).

6

Petruzzi's IGA Supermarket, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir.), cert. denied, 114 S.Ct. 554 (1993).

With the passage of ERISA, Congress set out to "assure the equitable character of employee benefit plans and their financial soundness." Moench v. Robertson, 62 F.2d, 553, 560 (3d Cir. 1995) (citing Central States, Southeast and Southwest Areas Pension Fund v. Central Transp., Inc., 472 U.S. 559, 570, 105 S.Ct. 2833, 2840 (1985)) (internal quotations and alterations omitted). ERISA broadly defines the terms "employee pension benefit plan" and "pension plan" to include any plan established or maintained by an employer that, by its express terms:

> results in a deferral of income by employees
> for periods extending to the termination of
> covered employment or beyond, regardless of
> the method of calculating the contributions
> made to the plan, the method of calculating
> the benefits under the plan or the method of
> distributing benefits from the plan.

29 U.S.C. § 1002(2)(A)(ii). Thus, top hat plans clearly are subject to ERISA. Nonetheless, not every type of pension plan is subject to all of ERISA's stringent requirements. Congress imposed strict regulations over plans whose participants and beneficiaries it most desired to protect -- employer-funded plans designed to secure employees' financial security upon retirement. ERISA imposes upon the trustees and sponsors of such plans strict fiduciary duties and standards of care and further provides for detailed disclosure and vesting requirements. Top hat plans, however, which benefit only highly compensated executives, and largely exist as devices to defer taxes, do not require such

7

scrutiny and are exempted from much of ERISA's regulatory scheme. See Barrowclough v. Kidder, Peabody & Co., 752 F.2d 923, 930 n.7 (3d Cir. 1985).[0] In particular, top hat plans are not subject to certain vesting, participation, and fiduciary requirements. Id. at 930-31. But despite the exemption of top hat plans from many of ERISA's regulations, ERISA's enforcement provision clearly permits participants in top hat plans, as well as other covered plans, to bring civil actions "to enforce the substantive provisions of the Act or to recover benefits due or otherwise enforce the terms of the plan." Id. at 935; see 29 U.S.C. §1132(1)(B) ("A civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.").

Contrary to ICI's intimations, then, Congress' decision to exempt top hat plans from certain fiduciary standards does not mean that courts may not review their trustees' and sponsors' actions. Rather, the exemption means only that they are not held to the strict fiduciary standards of loyalty and care otherwise applicable to ERISA fiduciaries.

In holding that ICI breached the terms of the plan, the district court appropriately applied contract principles. As we

[0]We overruled Barrowclough insofar as it held that arbitration of statutory ERISA claims is precluded in Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110 (3d Cir. 1993), but Barrowclough remains good law on the points for which we cite it here.

8

pointed out in Barrowclough, "this court has repeatedly considered claims for benefits by participants . . . that are based on the terms of or rights under a plan" even though such claims are based not on fiduciary duties but on "breach[es] of contract of an employee benefit plan." Id. at 935-36. Thus, in such instances, breach of contract principles, applied as a matter of federal common law, govern disputes arising out of the plan documents. In determining how to apply these principles, the district court followed the analysis in Carr v. First Nationwide Bank, 816 F. Supp. 1476 (N.D. Cal. 1993), which held that top hat plans should be interpreted in keeping with the principles that govern unilateral contracts.

Applying those principles to ICI's DEC plan, the district court noted that the plan provides that "amounts deferred . . . shall be paid . . . in five percentage installments unless . . . the Optionee files a written notice with the Secretary of Company . . . , requesting a different form of distribution." Kemmerer, 842 F. Supp. at 145. Therefore, the court reasoned, when appellants complied with all the prerequisites to vesting they accepted the ICI's offer. The plan terms then required ICI to fulfill its end of the bargain by making payments consistent with appellants' respective elections.

We agree. "A pension plan is a unilateral contract which creates a vested right in those employees who accept the offer it contains by continuing in employment for the requisite number of years." Pratt v. Petroleum Prod. Management Employee Sav. Plan, 920 F.2d 651, 661 (10th Cir. 1990) (internal quotation

9

marks omitted); Carr, 816 F. Supp. at 1488 ("[P]ension benefit plans are unilateral contracts which employees accept by appropriate performance."). Thus, the plan constitutes an offer that the employee, by participating in the plan, electing a distributive scheme, and serving the employer for the requisite number of years, accepts by performance. Under unilateral contract principles, once the employee performs, the offer becomes irrevocable, the contract is completed, and the employer is required to comply with its side of the bargain. Accordingly, when a participant leaves the employ of the company, the trustee is "required to determine benefits in accordance with the plan then in effect." Pratt, 920 F.2d at 661. As a corollary, "[s]ubsequent unilateral adoption of an amendment which is then used to defeat or diminish the [employee's] fully vested rights under the governing plan document is . . . ineffective." Id. Therefore, the district court correctly concluded that after the appellants' rights had vested when they completed performance, ICI could not terminate the plan in the absence of a specific provision in the plan authorizing it to do so.

ICI seeks to avoid this result by arguing that the plan terms do not impede its ability to terminate the plan. Specifically, ICI objects to what it perceives to be the district court's overbroad holding -- that in order to retain the power to terminate a top hat plan a company explicitly must reserve the right to do so in the plan documents. In the first place, ICI's argument is simply wrong after Barrowclough because it has no basis in contract law. In addition, we find ICI's argument more

10

than minimally unfair. As the Carr court recognized, even when a plan reserves to the sponsor an explicit right to terminate the plan, acceptance by performance closes that door under unilateral contract principles (unless an explicit right to terminate or amend after the participants' performance is reserved). "Any other interpretation . . . would make the Plan's several specific and mandatory provisions ineffective, rendering the promises embodied therein completely illusory." Carr, 816 F. Supp. at 1494. Thus, there is no presumption that an employer may terminate a top hat plan. Rather, the plan should be interpreted under principles of contract law. Consequently, a court must determine whether an employer has a right to terminate a plan by construing the terms of the plan itself.

ICI also contends that our result is incongruous because in its view we accord participants in unfunded plans more protection than participants in funded plans. Although the cases applying unilateral contract principles generally involve funded rather than unfunded plans, we agree with the Carr court that the cases' "holdings . . . did not rely on ERISA's provisions," id. at 1488, but rather on principles of contract law. Id., see also Pratt, 920 F.2d at 658. Indeed, any other result would eviscerate our holding in Barrowclough that participants in unfunded deferred compensation plans may sue to enforce the terms of the plan under contract principles.

In this regard, ICI's reliance on Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155 (3d Cir. 1990), is misplaced. In that case, we pointed out that "virtually every circuit has

11

rejected the proposition that ERISA's fiduciary duties attach to an employer's decision whether or not to amend an employee benefit plan." Id. at 1161. Of course, that only means that ERISA's fiduciary duties themselves do not per se "prohibit a company from eliminating previously offered benefits." (Phillips v. Amoco Oil Co., 799 F.2d 1464, 1471 (11th Cir. 1986), cert. denied, 481 U.S. 1016, 107 S.Ct. 1893 (1987). As one court has explained, "when an employer decides to establish, amend, or terminate a benefits plan, as opposed to managing any assets of the plan and administering the plan in accordance with its terms, its actions are not to be judged by fiduciary standards." Musto v. American Gen. Corp., 861 F.2d 897, 912 (6th Cir. 1988), cert. denied, 490 U.S. 1020, 109 S.Ct. 1745 (1989); see also Carr, 816 F. Supp. at 1489 ("[T]he rule that [funded] welfare benefit plans are freely amendable means that the amendment or termination of such plans is not governed by the fiduciary duty provisions of ERISA.").

But these cases do not say anything about the application of unilateral contract principles to an employer's actions in terminating a plan. The fact that fiduciary standards are inapplicable "does not give employers carte blanche to amend welfare benefit plans where the plans themselves may be interpreted to provide that benefits are contractually vested or accrued." Carr, 816 F. Supp. at 1489. And, as we discussed above, those principles clearly apply after performance is complete and the participant's rights have vested. Moreover, nothing in ERISA prohibits the parties from contracting to limit

12

the employer's right to amend or terminate a plan.  Indeed, the point of our holding in Barrowclough was to ensure that participants in ERISA plans have an ERISA-based right to sue under contract principles to enforce the terms of the plan.  As the district court reasoned, Congress exempted top hat plans from ERISA's vesting requirements in large part because it recognized that high level executives retain sufficient bargaining power to negotiate particular terms and rights under the plan and therefore do not need ERISA's substantive rights and protections.  Kemmerer v. ICI, 842 F. Supp. at 144.  This being so, "'it would be absurd to deny such individuals the ability to enforce the terms of their plans in contract. . . .  [I]t would be difficult to imagine what Top Hat participants would have the power to obtain through negotiation or otherwise -- apparently not much more than illusory promises.'"  Id. (quoting Carr, 816 F. Supp. at 1492).

In this regard, ICI concedes that a plan provision that the plan's terms cannot be revoked is controlling.  See br. at 23 ("Ordinarily, plan sponsors have unfettered discretion to terminate pension plans, unless the plan documents provide to the contrary.").  This is just such a case.  In determining the actual terms of the plan, "ERISA plans, like contracts, are to be construed as a whole."  Alexander v. Primerica Holdings, Inc., 967 F.2d 90, 93 (3d Cir. 1992).  If the plan document is unambiguous, it can be construed as a matter of law.

The February 1, 1985 amendment to the plan, which we quote above, in no uncertain terms provides that a participant's

13

election of a particular method of payment is binding and irrevocable, and that it shall be complied with.  To conclude in the face of such language that ICI had unfettered discretion to disregard a participant's election would violate the plain meaning rule of contract interpretation.  See Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 613-16 (3d Cir. 1995) (discussing Pennsylvania common law rules of contract interpretation).  ICI contends that the language is at the very least ambiguous, and it points to extrinsic evidence tending to show that "the purpose of the amendment was to avoid the constructive receipt [tax] problem."  Reply br. at 4.[0] Furthermore, ICI contends that it terminated the plan because of its desire to protect the participants' unfunded balances and because of its concern that the tax deferral aspects of the plan might not survive the scrutiny of the Internal Revenue Service. Yet these circumstances in no way can alter the contractual principles that lead to our conclusion that the terms of the plan bound ICI so that, in the absence of appellants' consent, ICI could not change its method of payment.  The district court, therefore, correctly held that ICI violated the terms of the plan.

## B.  Damages

---

[0]Constructive receipt in this context refers to a situation in which participants exercise such a degree of control over plan assets so as to be deemed to have received the deferred income. In such cases, the income deferred could be considered taxable immediately.

14

After granting summary judgment to the appellants on liability, the district court found that appellants had failed to prove that ICI's termination of the plan damaged them. Appellants characterized their claim for damages as falling under 29 U.S.C. § 1132(a)(1)(B), which permits plan participants to sue to recover benefits due them under the plan, and 29 U.S.C. §1132(a)(3), which permits a participant to bring a civil action "to obtain . . . appropriate equitable relief . . . to enforce any provisions of this subchapter or the terms of the plan."

In addressing the parties' summary judgment motions, the district court rejected ICI's argument that the damages appellants sought constituted unrecoverable extracontractual damages. Kemmerer v. ICI, 842 F. Supp. at 146. ICI contends that the district court erred in that determination. The question ICI raises is difficult, requiring a close examination of precisely what damages appellants seek. In Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 144, 105 S.Ct. 3085, 3091 (1985), the Court noted that "the statutory provision explicitly authorizing a beneficiary to bring an action to enforce his rights under the plan -- § [1132(a)(1)(B)] says nothing about the recovery of extracontractual damages." And in Mertens v. Hewitt Assocs., 113 S.Ct. 2071-72, 2068 (1993), the Court held that the provision for equitable relief in section 1132(a)(3) does not allow the recovery of monetary damages. In In re Unisys Corp., 57 F.3d 1255, 1267-68 (3d Cir. 1995), we held that an individual participant may sue on his or her own behalf to recover equitable relief under section 1132(a)(3), and characterized reimbursements

15

of back benefits as "remedies which are restitutionary in nature and thus equitable." Id. at 1269 (citing Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 238-39 (3d Cir. 1994)).

We are inclined to agree with ICI that appellants' claims are for extracontractual damages for purposes of section 1132(a)(1)(B) and monetary damages for purposes of section 1132(a)(3) and thus are not cognizable claims under ERISA. After all, the possibly adverse tax ramifications of the plan termination and the financial management fees which appellants may incur are possible consequences of the breach. On the other hand, the plan required ICI to pay money, and by its payment of their account balances to the appellants, ICI satisfied that obligation, though it did so prematurely. Further, it is difficult for us to see how such damages can be regarded as claims for equitable relief under section 1132(a)(3). But be that as it may, we decline to resolve such intricate issues of ERISA law because appellants failed at trial to prove they were damaged at all.[0]

In the first instance, we reject appellants' argument that the district court improperly placed the burden of proof on them. They rely on the proposition that when the existence of damage is clear, damages should not be denied simply because it is difficult to quantify the amount of loss. As a corollary, appellants argue that after they have proved they have been damaged, the district court cannot rely on burden of proof

---

[0]Appellants concede that they can advance damage claims only under ERISA.

principles to reject their damages claims outright.  For this proposition they rely on Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187 (1946).  But in that Fair Labor Standards Act case, the Court assumed that "the employee has proved that he has performed work and has not been paid in accordance with the statute."  Id. at 688, 66 S.Ct. at 1193.  As the Court noted, "[t]he damage is therefore certain.  The uncertainty lies only in the amount of damages arising from the statutory violation by the employer."  Id.  Here, the opposite is true -- the very existence of damages is in dispute.  ICI presented persuasive evidence that appellants had not suffered any damages.  When the very issue of damages is the subject of a good faith dispute, the principle that "'it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts'" simply does not apply.  Id. (quoting Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250 (1931)).

Nor are we moved by appellants' contention that the burden should shift simply because this is an ERISA case.  To be sure, courts have, in certain ERISA cases, placed the burden of proof on the trustee of the plan.  But those cases involved first, the trustee's breach of fiduciary duty, and second, a definite loss.  For instance, in Martin v. Feilen, 965 F.2d 660 (8th Cir. 1992), cert. denied, 113 S.Ct. 979 (1993), the court held that "once the ERISA plaintiff has proved a breach of fiduciary duty and a prima facie case of loss to the plan or ill-gotten profit to the fiduciary, the burden of persuasion shifts

17

to the fiduciary to prove that the loss was not caused by, or his profit was not attributable to, the breach of duty."  Id. at 671.  Neither of the prerequisites to burden-shifting is present here.

Turning to the evidence of damages, we are troubled by the fact that appellants, though claiming they were aggrieved by the plan termination, failed to request equitable relief requiring ICI to comply with the plan terms.  Even though ICI advised them in November 1991 that it was changing the distribution schedule, they brought this action almost one year later, and only after ICI made one payment to them, and they filed a motion for summary judgment only after ICI made two of the accelerated payments.  Yet section 1132(a)(3) explicitly authorizes participants to bring civil actions "to enjoin any act . . . which violates . . . the terms of the plan" and "to obtain . . . equitable relief . . . to enforce . . . the terms of the plan."  Surely, if appellants really felt that ICI had injured them, they could have rejected the accelerated payments and sought injunctive relief enforcing the terms of the plan.  Given the circumstances, it seems obvious that appellants sought to play a no-lose game -- trying to capitalize on the freed-up funds but claiming damages based on utterly speculative projections as to the financial consequences had the plan not been terminated.

Indeed, appellants' projections of damages at the trial were so speculative as to be unascertainable.  First, they contended that they suffered tax-related losses because they were forced immediately to pay taxes on the accelerated payments to them and thereby forgo the benefits of tax deferral.  Standing

18

alone there would be force to this argument because ordinarily from a taxpayer's viewpoint it is advantageous to defer the payment of taxes. Yet the existence of such damages depends in part on what the tax rate will be at any given time and thus is speculative. And, as ICI properly points out, by virtue of the plan termination the appellants' account balances were taxed at a much lower rate than would have been the case had payments been made several years later. Furthermore the tax consequences of the accelerated payments were simply part of a larger picture including investment rates of return which the district court concluded did not establish that appellants had suffered or would suffer any financial loss as a result of the acceleration of payments.

Second, the appellants contended that they incurred management fees and transactions costs as a result of the breach. But ICI presented evidence that appellants "can replicate the investment options under [the] DEC without incurring material transaction costs." Op. at 6. The district court credited this testimony and concluded that "I cannot find . . . that it is more likely true than not that plaintiffs will now incur either material transactions costs or management fees." Op. at 6-7. The district court's finding is certainly supported by the record.

Most significantly, appellants' expert did not take into account the risk involved in keeping money in an unfunded plan. The district court pointed out that "[a]ny evaluation of one's interest in an unfunded plan must . . . give some consideration to the fact that there is a risk to the participant

19

that there will be no funds and the value of his interest in the plan should be adjusted to reflect that risk." Op. at 6. The failure to take the risk into account not only called all of appellants' projections into question, but is itself a reason for denying damages because a conclusion that they were damaged would rest on insupportable speculation.[0] In light of all of these factors, we cannot say that the district court's conclusion that appellants failed to prove that they were damaged was clearly erroneous. Oberti v. Board of Educ., 995 F.2d 1204, 1220 (3d Cir. 1993).[0] Thus, we cannot find that they were entitled to relief in this case.[0]

## Conclusion

For the reasons detailed above, we will affirm the district court's judgment of December 23, 1994, in favor of ICI and its order of January 5, 1994, granting appellants summary judgment on liability, and we will dismiss as moot ICI's appeal from the order of January 5, 1994, to the extent that the order denied ICI summary judgment on damages.

---

[0] Thus, we reject appellants' argument that the district court failed to make adequate findings.

[0] The conclusion we expressed above that ICI's concern about the security of the participants' accounts in the DEC plan did not justify its termination of the plan, does not mean that the security factor cannot be considered in a damages calculation.

[0] We realize that in some situations a wronged plaintiff may recover nominal damages without proof of actual injury. See e.g., Carey v. Piphus, 435 U.S. 247, 266, 98 S.Ct. 1042, 1054 (1978). We see no reason, however, to apply that principle here as we do not regard the right which appellants seek to vindicate as worthy of such special protection.

20