Cornelius PRIOR, Jr. Plaintiff,

v.

**INNOVATIVE COMMUNICATION CORP. f/k/a Atlantic Tele-Network, Co. Defendant.**

**No. CIV.A.99–0232.**

District Court, Virgin Islands, D. St. Thomas and St. John.

March 8, 2005.

J. Daryl Dodson, Esq., Moore Dodson & Russell, P.C., St. Thomas, VI, for Plaintiff.

Joel H. Holt, Esq., St. Croix, VI, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BROTMAN, District Judge, sitting by designation.

Plaintiff Cornelius Prior, Jr. ("Prior" or "Plaintiff") initiated this action on December 29, 1999, in the District Court of the Virgin Islands, Division of St. Thomas and St. John, seeking to recover supplemental pension benefits allegedly owed to him by Defendant Innovative Communication Corp. ("Defendant" or "ICC").

Mr. Prior claims that he is entitled to collect a supplemental benefit under the terms of a 1987 Employment Agreement (the "1987 Employment Agreement") entered into with Atlantic Tele–Network Co. The parties disagree as to the consequences of the 1997 division of Atlantic Tele–Network Co.'s parent corporation, Atlantic Tele–Network, Inc. ("ATN"), into two entities. They dispute as to whether the supplemental benefit continued to exist after the split transaction and, if so, to which company it was allocated when ATN was divided.

Plaintiff alleges that Defendant ICC's predecessor corporation, Emerging Communications, Inc. ("ECI"), assumed all pension assets and liabilities of ATN as a result of the 1997 split transaction. Plaintiff further alleges that these pension assets and liabilities included the supplemental benefit owed to him under the 1987 Employment Agreement. The parties also dispute whether this supplemental benefit qualifies as a plan, specifically a "top hat" plan, under the Employment Retirement Income Security Act ("ERISA.") ERISA, 29 U.S.C. §§ 1001–1461.

Defendant ICC contends that it has paid Plaintiff all pension benefits to which he is entitled and any further pension obligation remained with Mr. Prior's company after the division of ATN in 1997. Defendant alternatively argues that Mr. Prior waived his right to the supplemental benefits as a part of the negotiations for the 1997 split transaction.

The Court previously entered an Opinion on the Parties' Cross Motions for Summary Judgment on May 22, 2003. In the Opinion, the Court concluded that there was a genuine issue of fact regarding which company the parties intended to

allocate the supplemental benefit liability to upon the completion of the 1997 split transaction. (May 22, 2003 Op. at 19). As a result, this matter was tried before the Court, sitting without a jury, on September 13 and 14, 2004, wherein the Court heard the testimony of witnesses, examined the submissions of the parties, and considered arguments from counsel.

In November 2004, the Court entered a Stipulation and Order, agreed to by the parties, which dismissed with prejudice all counterclaims and third party claims against Plaintiff Prior, Jr. and those against Craig Knock.

After a careful review of the record, the Court enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. *FINDINGS OF FACT.*

### A. *Undisputed Facts.*

1. In 1987, Plaintiff Prior and Jeffery Prosser ("Prosser") formed a telecommunications corporation. (J. Ex. 3 at 3–5; Pl.'s Prop. Finds. of Fact & Concl. of L. ¶ 1 & 13; Def.'s Prop. Finds. of Fact & Concl. of L. ¶ 1).

2. Under the terms of his 1987 Employment Agreement, Prior became President and Co–CEO, with Prosser, of Atlantic Tele–Network Co. (J. Ex. 2.)

3. The parties have no dispute as to the qualified pension funds. (Prior Test., Tr. at 73; Pl.'s Prop. Finds. of Fact & Concl. of L. ¶ 95; Def.'s Prop. Finds. of Fact & Concl. of L. ¶ 22.)

4. After a number of years of growth and acquisitions, Atlantic Tele–Network Co. ultimately became a subsidiary of Atlantic Tele–Network, Inc. ("ATN"). (IPO Prospectus, J. Ex. 3.)

5. In order to further expand its operations, ATN underwent an initial public offering in 1991. (Notices of Annual Meeting, J. Ex. 43.)

6. Each year, from the time the company went public in 1991 until the company was divided in 1997, Prior's supplement benefit was disclosed in proxy statements which were reported to shareholders and filed with the Securities and Exchange Commission. (J. Ex. 43; Stern Depo., Pl.'s Ex. 1 at 9; Pl.'s Prop. Finds. of Fact & Concl. of L. ¶ 86; Def.'s Prop. Finds. of Fact & Concl. of L. ¶ 7.)

7. In 1995, a management deadlock developed between the Co–CEO's, Prior and Prosser, regarding the company's expansion and other management issues. (Prospectus, J. Ex. 32 at 23–24.) As a result, litigation ensued in both the federal and local courts over the control of ATN. (*Id.*) When it became apparent that no potential buyers were interested in purchasing ATN, Prior and Prosser agreed to divide the company into two separate entities. (Prospectus, J. Ex. 32 at 23.)

8. Paragraph 11 of the Principal Terms Agreement ("PTA") states:
   Obligations under any such employee benefit or pension plan with respect to Messers. Prior and Prosser shall be allocated to Old ATNI (Prior's entity) and New ATN (Prosser's entity) as the case may be, and the funds held under any such plans shall be divided and placed under control of trustees or custodians designated by Old ATNI and New ATN, respectively.
   (J. Ex. 5.)

9. The Subscription Agreement ("SA") states:
   WHEREAS, to eliminate corporate disputes and to maximize the value of the Company for the benefit of the

Company and its stockholders, the Company has entered into a Principal Terms Agreement dated January 29, 1997 among the Company and its co-chief executive officers and principal stockholders, Cornelius B. Prior, Jr. ("Prior") and Jeffrey J. Prosser ("Prosser"), which contemplates the separation of the businesses and assets of the Company in the manner set forth herein and in the Recapitalization Agreement (as defined below) and the Merger Agreement . . .

(J. Ex. 34 at 1 ¶ 2.)

10. For the split transaction, ATN transferred all capital stock of ATN Co. (including its ownership interest in the Virgin Islands Telephone Co. ("VITELCO") to ECI (n/k/a ICC)). (Prospectus, J. Ex. 32; May 22, 2003, Ct. Op. at 7.) Prosser exchanged all of his ATN common stock for a majority interest in ECI. Prior exchanged all of his shares of ATN common stock for $17,400,000 and a majority interest in the restructured ATN, Inc. (*Id.*) All public stockholders of ATN exchanged their stock for stock in ECI and the restructured ATN, Inc. Prior's Guyana holdings retained the use of the name ATN, Inc., while Prosser's company eventually became ICC. (*Id.*)

11. On December 31, 1997, the split transaction dividing ATN was completed. (J. Exs. 33 & 34.)

**B. Findings of Fact on the Factual History.**

1. At the time of formation of the business, both Prior and Prosser negotiated employment agreements with Atlantic Tele–Network Co. (1987 Employment Agreement, J. Ex. 1; Prosser's Employment Agreement, J. Ex. 2; Pl.'s Prop. Finds. of Fact & Concl. of L. ¶ 4).

2. In addition to a funded pension plan provided to all salaried employees of Atlantic Tele–Network Co., the 1987 Employment Agreement provided Prior with a supplemental pension benefit. (J. Ex. 2 at 2 ¶ 3.4; Stern Depo., Pl's Ex. 1 at 6–7.)

3. The supplemental benefits created under the 1987 Employment Agreement provided additional pension benefits for company executives beyond what the regular qualified pension plan offered. Plaintiff's supplemental benefit was designed to replace benefits he lost when he left his previous employer, the investment banking firm of Kidder Peabody, at the age of 53 to become Co–CEO of Atlantic Tele–Network Co. (Prior Test., Tr. at 34–35; Pl.'s Prop. Finds. of Fact & Concl. of L. ¶¶ 4 & 6.)

4. In January 1997, Prior and Prosser reached an agreement whereby Prior and the public shareholders would control the holdings in Guyana ("GT & T") and Prosser would own the Virgin Islands holdings in Atlantic Tele–Network Co. which also retained ownership of VITELCO. (J. Ex. 32; Def.'s Prop. Finds. of Fact & Concl. of L. ¶ 10.) On January 24, 1997, Prior's attorney sent a memorandum (the "January 24th Memo") to Prosser's attorneys which memorialized the broad principals for this Prior–Prosser agreement to divide their interests in ATN between them. (J. Ex. 4; Prior Test., Tr. at 43–44; Def.'s Prop. Finds. of Fact & Concl. of L. ¶ 11.)

5. The January 24th Memo specifically addresses the supplemental pension issue, stating:

The funds in trust for the ATN, Inc. pension plan need to be separated out for ATN–VI and ATN–G. [Prior] and [Prosser] each have rights to supple-

mental, contractual pensions under their original 1987 employment agreements with ATN, Inc. The obligations of ATN, Inc., under these agreements should be allocated to ATN–VI (with respect to [Prosser]) and ATN–G (with respect to [Prior]). . . .

(January 24th Memo, J. Ex. 4 at ¶ 19.)

6. Paragraph 19 of the January 24th Memo addresses both the funds in trust for the qualified pension plan and the Co–CEO's supplemental benefit plans. (J. Ex. 4; Pl.'s Prop. Finds. of Fact & Concl. of L. ¶¶ 29 & 30.)

7. The understanding with respect to the supplemental benefit plans represented by the January 24th Memo was that each plan would follow the Co–CEO's, Prior and Prosser, thereby being allocated to their respective companies after the division of ATN. (Pl.'s Prop. Finds of Fact & Concl. of L. ¶ 30; Prior Test., Tr. at 59.)

8. On January 29, 1997, the parties entered into a Principal Terms Agreement (the "PTA") which formally agreed to the broad terms outlined in the January 24th Memo. (J. Ex. 5; Pl.'s Prop. Finds of Fact & Concl. of L. ¶ 35; Def.'s Prop. Finds of Fact & Concl. of L. ¶ 12.) Paragraph 11 of the PTA was meant to reflect the understanding found in paragraph 19 from the January 24th Memo. (Stern Depo., Pl.'s Ex. 1 at 15–17.)

9. The PTA was signed by Prior and Prosser, individually and as Co–CEO's, and was approved by ATN's Board. (J. Exs. 5 & 6.)

10. ATN retained Deloitte & Touche LLP ("Deloitte"), the accounting firm which handled ATN's pension plans, to assess the effect of the PTA on the existing benefits programs. (J. Ex. 8; Pl.'s Prop. Finds. of Fact & Concl. of L. ¶ 49; Def.'s Prop. Finds. of Fact & Concl. of L. ¶ 14.)

11. After reviewing the PTA, Deloitte made recommendations by letter dated February 28, 1997, some of which applied to the qualified pension plan. (Deloitte Ltr. dated Feb. 28, 1997, J. Ex. 8.)

12. Deloitte's review and recommendation only addressed the qualified pension plan and did not consider the supplemental benefit plans. Before addressing employee benefits, the letter states: "[y]ou have indicated that there are no non-qualified pension or deferred compensation arrangements to be concerned about." (Deloitte Ltr., J. Ex. 8 at 2.)

13. With respect to the qualified plans, Deloitte recommended a change from what was originally contemplated. Deloitte recommended that the funds in trust under the qualified pension plan should not be divided as originally contemplated, but that Prosser's company should substitute for ATN as plan sponsor. (J. Ex. 8; Pl.'s Prop. Finds. of Fact and Concl. of L. ¶ 50.) Deloitte based this recommendation on the fact that most of the employees would remain with Prosser's company. (J. Ex. 8.)

14. The parties implemented the change recommended by Deloitte for the qualified pension plan, allocating the trust funds for the qualified plan entirely to Prosser's company, ECI (n/k/a ICC). (Stern Depo., Def.'s Ex. 2 at 37–38.) As a result, the split transaction varied from the PTA only with respect to the qualified plan, according to the Deloitte recommendation. (J. Ex. 3; J. Ex. 5; J. Ex. 8.)

15. Over many months, the parties exchanged multiple drafts of the final agreements for the split transaction,

including the Subscription Agreement (the "SA"). (SA dated August 11, 1997, J. Ex. 34; Stern Depo., Pl.'s Ex. 1 at 45; Pl.'s Prop. Finds. of Fact & Concl. of L. ¶ 62.)

16. The SA and its accompanying documents lay out the specific details for implementing the broad terms of the transaction agreed upon by the parties in the PTA. (J. Ex. 34.)

17. On December 31, 1997, the split transaction was completed largely according to the terms of the SA and its accompanying transaction documents. (Minutes, J. Ex. 33; SA, J. Ex. 34.)

18. Employees allocated to Prior's company, including Prior himself, were to be treated as terminated under the qualified pension plan, and as a result would be entitled to a lump sum payment for vested pension benefits under the qualified plans. (J. Ex. 23; J. Ex. 8 at 4.)

19. After receiving payment of his regular pension benefits, Prior sought payment of his supplemental pension benefit from ICC, which ICC refused to pay. (Oct. 26, 1998 Ltr. from Benjamin, J. Ex. 27; Feb. 10, 1999 ltr. from Smalls, J. Ex. 29.)

## C. *Findings of Fact on ERISA.*

1. Plaintiff Prior's supplemental benefit was created under a 1987 Employment Agreement with Atlantic Tele–Network Co. which was entered into at the time of formation of a telecommunications business by Prior and Prosser. (J. Ex. 1 ¶ 3.4 at 3; ICC Depo. at 8).

2. Under the same agreement, Prior became President and Co–CEO of the company (J. Ex. 1; Prior Test., Tr. at 35–37).

3. The 1987 Employment Agreement resulted from negotiations between Mr. Prior, Atlantic Tele–Network Co., Mr. Prosser, and E.F. Hutton for the establishment of a telecommunications business. (ICC Depo. at 8, 12; Prior Test., Tr. at 34–35).

4. The supplemental benefit is also an unfunded liability as reflected by ATN proxy statements filed with the Securities and Exchange Commission. (J. Ex. 37).

5. Michael J. Tierney, a pension expert, testified that the supplemental benefits established by the 1987 Employment Agreement constitute a "top hat" plan. (J. Ex. 49; Tierney Test., Tr. at 139, *l.* 4–16.)

6. Not only did Plaintiff accept the offer for a supplemental benefit contained in his 1987 Employment Agreement by performing the requisite five years of service (Tierney Test., Tr. at 151), but the company acknowledged the vesting of the supplemental benefits in disclosure documents, long before the time of the split transaction. (1991 ATN, Inc. Prospectus, J. Ex. 3 at 52; 1992 ATN, Inc. Proxy Stmt., J. Ex. 37 at 7.)

7. Under the section entitled "Benefit Plans," the 1992 Proxy Statement of Atlantic Tele–Network, Inc. states:

Messrs. Prior and Prosser are entitled, under employment agreements with ATN–VI in effect from June 1987 to June 1990, to supplemental annual pension benefits equal to the difference between the amount, if any, which they actually receive under the Pension Plan and the amount which they would have received, under the Pension Plan benefit formula currently in effect as described above, had all compensation been paid to them by the Company or any of its subsidiaries been considered Compensation for purposes of the Pension Plan and, in

Mr. Prior's case, had he been an employee covered by the Pension Plan since June 1982. *These supplemental pension benefits are fully vested.* (*Emphasis added*). (1992 ATN, Inc. Proxy Stmt., J. Ex. 37 at 7.)

### D. Findings of Fact on the Allocation of Plaintiff's Supplemental Benefit after Division of the Company.

1. Over the course of a year, the split transaction required complicated negotiations, the documents for which underwent multiple drafts (J. Exs. 4, 5, 12, 16, 17 & 54) before a finalization of the SA in August 1997 (J. Ex. 34) and completion of the transaction in December of 1997. (Mins. of ATN Bd. Mtg. dated Dec. 30, 1997, J. Ex. 33).

2. The rough outline of the transaction was introduced in the January 24th Memo and memorialized in the Principal Terms Agreement dated January 29, 1997 (the "PTA") (J. Ex. 5; Pl.'s Prop. Finds. of Fact & Concl. of L. ¶ 35.) The final split transaction agreements, including the SA, particularize and set out the details to implement the agreement to separate the businesses and assets represented by the PTA.

3. After the signing of the PTA on January 29, 1997, the Chief Financial Officer of ATN requested that Deloitte review the planned allocation of pension, welfare and fringe benefit programs as outlined by the PTA for the split transaction. (Deloitte Ltr., J. Ex. 8). In this evaluation, Deloitte did not address unfunded or deferred compensation programs, instead only considering the qualified pension plan. (Deloitte Ltr., J. Ex. 8 at 1. *See also* J. Lingo, for Deloitte & Touche, Depo., Def.'s Ex. 6 at 10.)

4. Only a small number of employees would be going to Prior's company after the split and the bulk of the employees would stay with Prosser's company. (J. Ex. 8) The accounting firm recommended that the assets of the qualified plans should not be divided as originally contemplated by the PTA because "the costs of a plan spin-off would greatly outweigh the benefits that would be protected." (J. Ex. 8 at 3).

5. Under the PTA, the parties had originally planned to divide all pension assets and liabilities between the two entities, according to where the employees were allocated. (PTA, J. Ex. 5 at 21 ¶ 11; Stern. Depo., Pl.'s Ex. 1 at 19; Test. of Prior. Tr. at 49–51.) The Deloitte recommendation for the qualified pension plan was adopted by the parties and represents a change from the original agreement found in the PTA.

6. The split transaction unfolded differently from what was originally contemplated by the PTA. (Stern Depo., Pl.'s Ex. P–1 at 17–18, *l.* 24 to *l.* 12; Pl.'s Prop. Finds. of Fact & Concl. of L. ¶ 56.)

7. With respect to the qualified pension plan, the parties made the change recommended by Deloitte, allocating the qualified pension plan entirely to Prosser's company which is now Defendant ICC. (Pl.'s Prop. Finds. of Fact & Concl. of L. ¶ 56; Def.'s Prop. Finds. of Fact & Concl. of L. ¶ 17.)

8. Deloitte's recommendation did not address the supplemental benefits which Plaintiff seeks now to collect. (J. Ex. 8 at 1. *See* Findings of Fact, *supra.* at Factual History ¶ 12.)

9. After the transaction, the qualified pension plan were allocated to Prosser's company, ICC in accordance

with the Deloitte recommendation. (J. Ex. 8 at 3–5; Pl.'s Prop. Finds. of Fact & Concl. of L. ¶ 56.) Those employees who went with Prior's company, including Prior himself, received a lump sum payment for their qualified pension benefits. (*Id.*)

10. As a result of the decision to follow Deloitte's recommendation, the qualified pension plan assumed by ICC could potentially develop a plan deficit, estimated to be in excess of three million dollars. (J. Ex. 32 at F–59; Stern Depo., P.Ex. 1 at 37–38.)

11. The parties each claim that the EBA, Exhibit G to the SA, should be interpreted in their favor. (May 22, 2003 Ct. Op. at 19.) Conflicting testimony was presented with respect to the EBA. (EBA, J. Ex. 35; Shulman's Depo., Def.'s Ex. 8 & Pl.'s Ex. 5 at 3–5; Farley's Depo., Pl.'s Ex. 9 at 50–51; Scerback Depo., Pl.'s Ex. 7 at 3–4 and Def.'s Ex. 7 at 39–44.)

12. The SA, along with its exhibits, particularizes the broad terms found in the PTA. (J. Ex. 5 at 1 ¶ 2; J. Ex. 35.)

13. Like the SA, the EBA implements the PTA, stating on page 1:

WHEREAS, to eliminate corporation disputes and to maximize the value of the Company for the benefit of the Company and its stockholders, the Company, and its co-chief executive officers and principal stockholders, Cornelius B. Prior, Jr. ("Prior") and Jeffrey J. Prosser ("Prosser"), entered into a Principal Terms Agreement dated January 29, 1997 which contemplated the separation of the businesses and assets of the Company; . . .

(J. Ex. 35.)

14. During the execution of the split transaction, no actions were taken with respect to the supplemental benefit plans belonging to Mr. Prior and Mr. Prosser. But, after the transaction was completed, ICC f/k/a ECI no longer listed the supplemental plan liabilities in its disclosures. (Prospectus, J. Ex. 32 at F–58, note J; ECI Registration Stmt., J. Ex. 34.)

15. Plaintiff's counsel reviewed the Prospectus disclosure language on or about June 17, 1997. (J. Ex. 21.)

16. Those same plan liabilities had been listed by ATN each year before the division of the company. (ATN IPO Prospectus, J. Ex. 3 at 52; J. Ex. 43; Pl.'s Prop. Finds. of Fact & Concl. of L. ¶ 86.)

17. At trial, extrinsic evidence was presented to interpret the intent of the parties with respect to allocation of the supplemental benefits after the completion of the split transaction. John Raynor, a member of ATN's Board, stated that paragraph 19 of the January 24th Memo contained the understanding between the parties with respect to allocation of the supplemental pension benefit "throughout the transaction." (Raynor Depo., Def.'s Ex. 3 & Pl.'s Ex. 3 at 52 *l.* 2–24.) As discussed, the January 24th Memo allocates the obligations under the supplemental benefit plans to each Co–CEO's new entity respectively. (J. Ex. 4 at 5.)

18. Plaintiff Prior verified that all communications made on his behalf to negotiate the transaction were routed through Attorney Stern. (Prior Test., Tr. at 107, *l.* 13–22; 108, *l.* 1–8; & 109, *l.* 6–9.)

19. Attorney Stern agreed that the supplemental pensions were not discussed further during negotiations after the January 24th Memo. (Stern Depo., Pl.'s Ex. 1 & Def.'s Ex. 2 at 34,

*l.* 12–19 & 50 *l.* 18–21.[1] *See also* Prosser Depo., Def.'s Ex. 9 at 8.)

20. Attorney Stern stated that paragraph 11 of the PTA was intended to incorporate the understanding found in the January 24th Memo with respect to the supplemental benefits. (Pl.'s Ex. 1 & Def.'s Ex. 2 at 15, *l.* 12 to 17, *l.* 16.)

21. Plaintiff agreed that paragraph 11 of the PTA was intended to adopt the division of pension assets and liabilities as suggested by the January 24th Memo (J. Ex. 4; Prior Test., Tr. at 50, *l.* 25—51, *l.* 3).

22. When asked to interpret paragraph 11 of the PTA, Mr. Prior stated that "both plans [qualified and supplemental] are to be separated, assets and liabilities, depending on where the people go." (Prior Test., Tr. 51, *l.* 8–9.)

## II. *CONCLUSIONS OF LAW.*

### A. *Jurisdiction.*

1. The Court has subject matter jurisdiction over this matter pursuant to 29 U.S.C. § 1132(a) and 28 U.S.C. § 1331 and Section 22 of the Revised Organic Act of 1954, 48 U.S.C. §§ 1541–1645 (1995 & Supp.2001) because Plaintiff seeks payment of benefits under a plan pursuant to ERISA, 29 U.S.C. §§ 1001–1461.

### B. *ERISA Coverage for Unfunded Supplemental Benefit Plans.*

1. ERISA applies broadly to "any employee benefit plan if it is established or maintained . . . by any employer engaged in commerce . . ." 29 U.S.C. § 1003(a) (1988).

2. Coverage under ERISA should be construed liberally. *Colarusso v. Transcapital Fiscal Sys.*, 227 F.Supp.2d 243, 251 (D.N.J.2002).

3. The key, then, for determining whether a "plan" has been established will be whether the employer has expressed an intention to provide benefits on a regular and long-term basis. *Deibler v. United Food & Cmty. Workers' Local Union 23*, 973 F.2d 206, 209 (3d Cir.1992) (*citing Wickman v. N.W. Nat'l Ins.*, 908 F.2d 1077, 1083 (1st Cir.1990)).

4. Certain unfunded executive deferred compensation arrangements are referred to as "top hat" plans. Under ERISA, these plans must be unfunded and "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." ERISA § 201(2), 29 U.S.C. § 1051(2) (1994).

5. "Top hat" plans fall within the statutory definition of an employee benefit plan but are exempt from many of ERISA's more stringent requirements. *Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923, 929–31 (3d Cir.1985), *overruled in part by Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110 (3d Cir. 1993) (overruling *Barrowclough* only as to an unrelated point regarding the arbitration of ERISA claims).

6. Only the reporting and disclosure rules, enforcement mechanism and preemption apply to these plans. *Id.*

---

**1.** Plaintiff's Proposed Findings of Fact & Conclusions of Law at Paragraph 102 cites to the Stern Deposition, stating, in part: "throughout the course of negotiating the Definitive Documentation called for in the January 24 Memo, no one ever suggested that Prior or the Prior Entity agreed to abandon Prior's rights to a Supplemental Benefit; indeed the subject never came up from January 24 Memo onwards."

An important factor in determining that an unfunded plan constitutes a "top hat" plan is whether an executive has the power to negotiate the terms of an individualized pension benefit. *See, e.g., Duggan v. Hobbs,* 99 F.3d 307, 312–13 (9th Cir.1996); *Gallione v. Flaherty,* 70 F.3d 724, 726–28 (2d Cir. 1995).

7. Plaintiff was an executive of the company and had the ability to negotiate the terms for an individualized pension benefit. The Court finds that the supplemental benefit claimed by Plaintiff under the terms of the 1987 Employment Agreement constitutes a plan under ERISA and also qualifies as a "top hat" plan.

C. *No Waiver of Supplemental Benefit Plan.*

1. The Third Circuit has stated that "top hat plans are ... governed by general principles of federal common law." *In re New Valley Corp.,* 89 F.3d 143, 149 (3d Cir.1996). An offer of a pension benefit provides "a unilateral contract which creates a vested right in those employees who accept the offer it contains by continuing in employment for the requisite number of years." *Kemmerer v. ICI Americas Inc.,* 70 F.3d 281, 288 (3d Cir. 1995). As a result, an employer may not terminate a pension plan once it has vested. Instead, the plan is an offer, and the employee, by participating in the plan, choosing a distribution scheme and completing the required number of years, accepts by performance. At that point, the offer becomes irrevocable and the employer must comply with the terms of the agreement. *Id.* It is not possible for an employer to unilaterally eliminate the plan, nor is it possible to change the plan without reserving the right to do so.

2. Once vested, an ERISA pension benefit becomes a statutory right. In order to waive a statutory right the Supreme Court has held that "the waiver must be clear and unmistakable." *Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line,* 85 F.3d 1098, 1109 (3d Cir.1996) (*citing Metro. Edison Co. v. NLRB,* 460 U.S. 693, 708, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983)).

3. Plaintiff did not waive his right to the supplemental benefit as a part of the 1997 split transaction. The evidence of waiver is not clear and unmistakable and insufficient evidence was provided to support the conclusion that a waiver was made by Plaintiff.

4. Similarly, because Plaintiff's supplemental pension benefit was already vested, the supplemental benefit was not terminated in 1990 when the 1987 Employment Agreement expired.

D. *ERISA Procedural Requirements.*

1. When an employer does not comply with ERISA procedural requirements in establishing a plan, it is not thereby released from its obligations under the agreement to provide a plan. *See, e.g., Donovan v. Dillingham,* 688 F.2d 1367 (11th Cir. 1982). *Accord Colarusso v. Transcapital Fiscal Sys.,* 227 F.Supp.2d 243 (D.N.J.2002).

2. An agreement to provide a pension plan is governed by the policies of unilateral contracting. *Kemmerer,* 70 F.3d at 288. Once the offer for a plan is accepted by an employee's performance, an employer cannot be removed from liability simply by failing to fulfill its side of the bargain. *Id.*

3. Whether or not ERISA filings were made with respect to the supplemental benefits (the "top hat" plans), the plan was vested and was not negated by a lack of following procedural requirements. *Kemmerer*, 70 F.3d at 288.

4. Because Plaintiff's supplemental pension benefit was already vested, it was not terminated by any alleged failure on the part of the company to follow ERISA's procedural requirements.

### E. Allocation of Supplemental Pension Benefits During the Transaction.

█ 1. One question remains to settle this dispute: how did the parties intend to allocate the liability for Plaintiff's supplemental benefit (his "top hat" plan) after the split transaction was completed. Because the documents are ambiguous, the whole of what is said, done and written should be considered when evaluating how the liabilities for payment under the two supplemental benefit plans was allocated. (*See, e.g.*, May 22, 2003, Ct. Op. at 19.)

2. The documents and testimony show that the parties originally contemplated dividing the qualified pension plan assets and allocating the supplemental benefits plans to each Co–CEO's new company after the division of ATN.

3. The January 24th Memo, PTA and trial testimony show that the original understanding with respect to the qualified pension plan was to allocate it between the two companies according to where the employees would be allocated.

4. Following a recommendation from their accounting firm, Deloitte, the parties agreed to a depart from the PTA with respect to the qualified pension plan, which occurred after the execution of the PTA but before the completion of the transaction.

5. The documents and testimony reflect that the actual transaction proceeded differently from the original understanding found in the January 24th Memo and PTA because the qualified pension plan was taken over solely by ICC f/k/a ECI.

6. In consideration of the conflicting testimony and the document itself, the Court finds the EBA to be ambiguous and not controlling. (EBA, J. Ex. 35.) The Court concludes that the EBA was meant to reflect the understanding of the parties found in the PTA. Insufficient evidence was presented to support Plaintiff's contention that this understanding was modified during the subsequent negotiations or incorporated into the EBA.

7. The testimony of the persons cited, in the Findings of Fact above, is more credible and outweighs other testimony presented and also weighs in favor of the Defendant's interpretation of the transaction.

8. The evidence supports the conclusion that the parties did not intend for Prior's supplemental pension benefit to become a liability of ICC after division of the company, but instead agreed that the supplemental benefit plans should follow each Co–CEO to their respective companies. The weight of the credible evidence supports the conclusion that the Plaintiff's supplemental pension benefit was allocated to his company, ATN, Inc., from the outset of the decision to separate ATN into two entities.

9. Insufficient evidence was offered to show that the parties departed from their original understanding under the January 24th Memo and PTA with

respect to allocation of the liabilities for the supplemental benefit plans for Plaintiff Prior and Prosser. The Court finds that the parties did not seek to change the allocation of supplemental benefit plans at any point later in the transaction.

10. In light of the evidence presented, the Court finds that the intent of the parties when entering into the SA was to allocate the supplemental benefit plans as originally contemplated. The intent under the SA, therefore, was to allocate liability for Plaintiff's supplemental benefit plan to Plaintiff's company and to allocate liability for Prosser's supplemental benefit plan to his company, Defendant ICC.

11. Because the obligation was allocated to Plaintiff's company, Defendant ICC does not owe payment to Plaintiff Prior under the supplemental benefit plan, as created by the 1987 Employment Agreement.

12. For the reasons stated, the Court finds for Defendant ICC and judgment shall be entered in favor of the Defendant, with this matter to be dismissed with prejudice.

### ORDER

**THIS MATTER** having been tried before the Court, sitting without a jury, on September 13 and 14, 2004 wherein the Court heard the testimony of witnesses, examined the submissions of the parties, and considered the arguments from counsel; and

**IT APPEARING THAT** the evidence presented at trial supports the conclusion that the disputed supplemental benefit was allocated to Plaintiff's company during the split transaction; and

**FOR THE REASONS** stated in the Court's Findings of Fact and Conclusions of Law filed on this same date;

**NOW THEREFORE**, it is on this 8th day of March 2005;

**HEREBY ORDERED** that judgment shall be entered in favor of Defendant, Innovative Communications Corporation, with this matter to be **DISMISSED WITH PREJUDICE.**