J-A26036-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| SUSAN C. EYNON, AN INDIVIDUAL, AND THOMAS M. WHITE, AN INDIVIDUAL, ON BEHALF OF THEMSELVES AND ALL OTHER PERSONS SIMILARLY SITUATED | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : | |
| v. | : : : | No. 673 WDA 2023 |
| UNITED STATES STEEL CORPORATION, A DELAWARE CORPORATION | : : : : | |

Appeal from the Order Entered April 25, 2023
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  G.D. No. 20-003630

BEFORE:  BOWES, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:        **FILED: MARCH 18, 2025**

Appellants, Susan C. Eynon, an individual, and Thomas M. White, an individual, on behalf of themselves and all other persons similarly situated, appeal from the trial court's April 25, 2023 order granting Appellee's, United States Steel Corporation, a Delaware Corporation ("U.S. Steel"), motion for judgment on the pleadings.  We affirm.

In Appellants' amended complaint, they alleged, *inter alia*, that they both had their employment terminated by U.S. Steel in the spring of 2016, due to reorganization and downsizing of U.S. Steel's work force.  Amended Complaint, 3/22/22, at ¶¶ 8-9, 11.  They believed that approximately 300

other non-union employees of U.S. Steel similarly had their employment terminated in 2016. *Id.* at ¶¶ 10-11. These 300 other non-union employees constitute the putative class. *Id.* at ¶ 10.

According to Appellants, in or about 2005, U.S. Steel promulgated a Short-Term Incentive Plan for Non-Union Salaried Employees ("STIP" or "Plan"), through which its non-union employees would receive annual bonus payments. *Id.* at ¶ 12. Appellants attached a 2015 version of the Plan to their amended complaint, stating that it governed. *See id.* at ¶ 50.[1] Appellants claimed that they and the putative class understood that the quality of their job performance was a principal factor in determining the bonus they would receive, and they worked to maximize their bonus payment. *See id.* at ¶¶ 15, 52; *see also id.* at ¶ 13 ("Under the Plan, bonus payments to non-union employees were computed according to a standard financial formula and were based on a rating system by which the performance of individual employees, and the units or departments in which they worked, was reviewed and measured."); *id.* at ¶¶ 19, 52, 58 (acknowledging that, in addition to the performance of individual employees and units, U.S. Steel's operating revenues and earnings was also a factor in determining the bonus to be paid under the Plan). They alleged that U.S. Steel and its non-union employees mutually understood that the bonus was earned in the year the work was

---

[1] We further discuss the terms of the 2015 Plan *infra*. Briefly, though, Appellants maintain that Section 6(A) of the 2015 Plan "provided for a bonus payment to terminated employees for work performed up to termination in a given year, 2016 in this instance." Appellants' Brief at 7 (citations omitted).

performed, and that the right to the bonus payment vested in that year. *Id.* at ¶ 17. Appellants said that, historically, U.S. Steel paid the bonus to its non-union employees in March of the following year, including prorated bonus payments to terminated employees for the months they had worked in the year that their employment had been terminated. *Id.* at ¶¶ 18, 20; *see also id.* at ¶ 19 ("With the exception of one or two years between 2005 and 2016, when earnings were not sufficient to fund bonus payments, U.S. Steel routinely paid bonuses to its non-union employees, including employees whose employment had been terminated without cause."). However, Appellants averred that, when U.S. Steel distributed the 2016 bonus payments to its non-union employees in March of 2017, Appellants and other members of the putative class received no bonus payment for their work in 2016. *Id.* at ¶ 22. They alleged that, after accepting their work, U.S. Steel unilaterally decided to withhold the promised bonus payments from Appellants and the putative class solely because their employment had been terminated. *Id.* at ¶ 23. As a result, Appellants brought claims against U.S. Steel for breach of implied-in-fact contract; violation of the Wage Payment and Collection Law ("WPCL"), 43 P.S. §§ 260.1-260.45; promissory estoppel; and unjust enrichment.

In response to Appellants' amended complaint, U.S. Steel filed an answer and new matter. Among other things, U.S. Steel stated that the purpose of the Plan was to provide non-represented employees with an opportunity to earn an incentive award based upon the achievement of

corporate, unit, and individual performance goals during the calendar year in question. Answer and New Matter, 7/29/22, at ¶ 98. It explained that, effective January 1, 2007, and as of the first day of each year thereafter, U.S. Steel has amended and restated the Plan, such that each amended and restated Plan supersedes and displaces the previously operating iteration of the Plan. *Id.* at ¶ 100. U.S. Steel said that the 2016 Plan — not the 2015 Plan — governed the performance period from January 1, 2016 through December 31, 2016. *Id.* at ¶ 103. The 2016 Plan, which U.S. Steel attached to its answer and new matter, stated that Appellants and other non-union employees would not be eligible to be considered for a bonus payment if their employment was terminated for any reason prior to the end of 2016. *See id.* at ¶¶ 67, 101.

U.S. Steel further alleged that, when Appellants were advised that they were being laid off, they were presented with an Application for Benefits under the Supplemental Unemployment Benefit Program and Release ("Release"). *See id.* at ¶¶ 104-13. U.S. Steel claimed that both Appellants completed and executed the Release, and delivered it to U.S. Steel. *Id.* According to U.S. Steel, Appellants and members of the putative class who executed the Release waived their right to bring the at-issue claims. *Id.*

Appellants thereafter filed a reply to U.S. Steel's new matter. Appellants, *inter alia*, denied that the 2015 Plan was superseded and displaced on January 1, 2016, and averred that the actual amendment of the 2015 Plan did not occur until on or after October 28, 2016. Answer to New Matter,

8/7/22, at ¶ 101; *see also id.* at ¶ 100 (stating that "[t]he Plan usually was amended by [U.S. Steel] many months after the calendar year began on January 1"). Until the Plan was actually amended in 2016, Appellants alleged that non-represented employees of U.S. Steel worked under, and were entitled to be paid their bonuses pursuant to, the terms of the 2015 Plan. *Id.* Moreover, while Appellants admitted that they executed the Release, they denied that the Release discharges U.S. Steel from its obligation to pay the promised 2016 bonus to Appellants, or that the Release constitutes a waiver of their claim to that bonus. *Id.* at ¶¶ 105-07, 109-11. Appellants also said that U.S. Steel's demand that valuable employee rights be waived and released under these circumstances is unconscionable and violative of U.S. Steel's duty of good faith and fair dealing. *See id.* at ¶¶ 106, 110.

Following the closing of the pleadings, U.S. Steel filed a motion for judgment on the pleadings. It argued that: (1) Appellants' claims are barred under the Release that they executed; (2) alternatively, on the merits, each of their claims fails as a matter of law; and (3) alternatively, Appellants' WPCL claim is time-barred under the three-year statute of limitations. Appellants thereafter filed a response in opposition. U.S. Steel later filed a reply.

The trial court granted U.S. Steel's motion for judgment on the pleadings. Appellants filed a timely notice of appeal. The trial court did not order Appellants to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). It later filed a Rule 1925(a) opinion, explaining that Appellants released any claims that they could have made under the Plan

by signing the Release. Trial Court Opinion, 11/20/23, at 3-5 (unnumbered). It did not address the other alternative arguments U.S. Steel raised in support of its motion. *See id.* at 5 (unnumbered).

On appeal, Appellants raise the following issues for our review:

1. Did the [t]rial [c]ourt commit clear error of law in failing to interpret the subject Release in accordance with controlling Pennsylvania contract principles governing the interpretation and application of releases?

2. Did the [t]rial [c]ourt commit clear error of law in failing to recognize that the Release is a contract of adhesion, that the Release is against Pennsylvania public policy relating to protection of employees and employee earnings, and that the application of the Release to bar the claim for bonus is unconscionable under the circumstances of this case?

Appellants' Brief at 3.

Initially, we observe that, "[a]fter the relevant pleadings are closed, but within such time as not to unreasonably delay the trial, any party may move for judgment on the pleadings." Pa.R.Civ.P. 1034(a). It is well-established that:

A motion for judgment on the pleadings is similar to a demurrer. It may be entered when there are no disputed issues of fact and the moving party is entitled to judgment as a matter of law.

Appellate review of an order granting a motion for judgment on the pleadings is plenary. The appellate court will apply the same standard employed by the trial court. A trial court must confine its consideration to the pleadings and relevant documents. The court must accept as true all well[-]pleaded statements of fact, admissions, and any documents properly attached to the pleadings presented by the party against whom the motion is filed, considering only those facts which were specifically admitted.

We will affirm the grant of such a motion only when the moving party's right to succeed is certain and the case is so free from doubt that the trial would clearly be a fruitless exercise.

*Erie Ins. Exch. v. Mione*, 253 A.3d 754, 759 (Pa. Super. 2021) (citation omitted).

We also point out that "it is a well-settled doctrine in this Commonwealth that a trial court can be affirmed on any valid basis appearing of record." *Riverview Carpet & Flooring, Inc. v. Presbyterian SeniorCare*, 299 A.3d 937, 957 n.14 (Pa. Super. 2023) (citation omitted). "The precept may be applied even though the reason for sustaining the judgment was not raised in the trial court, relied on by that court in reaching its decision, or brought to the attention of the appellate courts." *Id.* (citation omitted).[2] Thus, while the trial court granted U.S. Steel's motion for judgment on the pleadings based on the Release, we may affirm its order on any valid basis appearing of record, including U.S. Steel's alternative argument that Appellants' claims fail as a matter of law. For efficiency and ease of disposition, we turn first to U.S. Steel's argument that Appellants' claims fail as a matter of law.[3]

---

[2] *See also In re A.J.R.-H.*, 188 A.3d 1157, 1176 (Pa. 2018) ("The rationale behind the 'right for any reason' doctrine is that appellate review is of the judgment or order before the appellate court, rather than any particular reasoning or rationale employed by the lower tribunal. … [A]n appellate court may apply the right for any reason doctrine where the correct basis for the ruling, order, decision, judgment or decree is clear upon the record. … The doctrine thus may be applied by a reviewing court if the established facts support a legal conclusion producing the same outcome.") (cleaned up).

[3] As mentioned *supra*, U.S. Steel raised the alternative argument that Appellants' claims fail as a matter of law in its motion for judgment on the pleadings, and Appellants responded to it in their response in opposition. In response to Appellants' appellate brief, U.S. Steel again raised this alternative argument to support this Court's affirming the trial court's order. Appellants

*(Footnote Continued Next Page)*

## Breach of Implied-In-Fact Contract

In Appellants' amended complaint, they first alleged that U.S. Steel breached an implied-in-fact contract. "A breach of contract action involves: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages." **Braun v. Wal-Mart Stores, Inc.**, 24 A.3d 875, 896 (Pa. Super. 2011), *aff'd*, 106 A.3d 656 (Pa. 2014) (citation omitted). "While every element must be pleaded specifically, it is axiomatic that a contract may be manifested orally, in writing, or as an inference from the acts and conduct of the parties." **Id.** (citation omitted). An implied-in-fact contract "has the same legal effect as any other contract" and "differs from an express contract only in the manner of its formation." **Ingrassia Const. Co., Inc. v. Walsh**, 486 A.2d 478, 483 n.7 (Pa. Super. 1984). "An express contract is formed by either written or verbal communication[,]" whereas the intent of the parties to a contract implied in fact "is inferred from their acts in light of the surrounding circumstances." **Id.** (citation omitted); **see also Liss & Marion, P.C. v. Recordex Acquisition Corp.**, 983 A.2d 652, 659 (Pa. Super. 2009) ("A contract implied in fact is an actual contract which arises where the parties

---

subsequently filed a motion to strike, arguing that U.S. Steel's alternative arguments were not decided by the trial court or raised by Appellants in their initial appellate brief, and should not be considered by this Court. Notwithstanding, Appellants responded to U.S. Steel's alternative arguments in their reply brief, for which they received permission to exceed the word limits. As discussed *supra*, because we may affirm on any valid basis appearing of record, even when the basis is not addressed by the trial court or raised by the appellant on appeal, we deny Appellants' motion to strike U.S. Steel's alternative arguments.

agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from acts in the light of the surrounding circumstances.") (citations omitted); *Ingrassia*, 486 A.2d at 483 ("Implied contracts … arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract.") (citation and footnote omitted).

With respect to Appellants' breach of implied-in-fact contract claim, they pled, *inter alia*, that "[t]he Plan embodied U.S. Steel's policy and practice of [paying] bonus payments to its non-union employees[,]" and that "[f]rom year to year, U.S. Steel accepted the work and services of its non-union employees, and routinely and consistently paid the bonuses promised to them for their work and services according to a 'Basic Incentive Award Formula' set forth in the Plan." Amended Complaint at ¶¶ 42-43. Appellants claimed that the 2015 Plan governed the bonus to be paid to them and all other members of the putative class. *Id.* at ¶ 50.[4] As in prior Plans, Appellants averred that Section 6(A) of the 2015 Plan provided that:

> [A] Participant [non-union employee] whose employment with [U.S. Steel] terminates for any reason prior to the payment of the

---

[4] In Appellants' reply to U.S. Steel's new matter, they stated again that the 2015 Plan governed. *See* Answer to New Matter at ¶ 101 ("The terms of the 2015 Plan were not 'superseded or displaced' on January 1, 2016. The actual amendment of the 2015 Plan did not occur until October 28, 2016. Until the Plan was actually amended in 2016, non-represented employees of U.S. Steel, including members of the putative [c]lass, **worked under and were entitled to be paid their bonuses pursuant to the terms of the 2015 Plan**.") (emphasis added).

award will not be entitled to an award under the Plan unless (i) the Participant is involuntarily terminated under circumstances which would qualify the Participant for benefits under the United States Steel Corporation Supplemental Unemployment Benefit Program for Non-Union Employees (the "SUB Program"), or a successor plan….

*Id.* at ¶ 49 (quoting Amended Complaint at Exhibit B ("2015 Plan") at § 6(A); some brackets added). Appellants alleged that they and other class members qualified for and were paid supplemental unemployment benefits — as described in Section 6(A) of the 2015 Plan— as a result of their layoff. *Id.* at ¶ 51.

Appellants said that, in one or more of the years between 2013 and 2016, U.S. Steel paid employees a prorated bonus for months they worked in the year in which they were laid off or terminated. *See id.* at ¶¶ 46-48. In addition, Appellants stated that, through annual performance reviews, U.S. Steel "informed its non-union employees of their entitlement to bonus and the performance expected of them to earn the bonus to be paid in exchange for their work." *Id.* at ¶ 54; *see also id.* at ¶ 52 ("In addition to U.S. Steel's operating revenues and earnings, the performance of individual employees and units was a principal factor in determining the bonus to be paid to U.S. Steel's non-union employees under the Plan.") (citing 2015 Plan at § 4(C)(iii)). Further, Appellants conveyed that "U.S. Steel communicated to its non-union employees its intention to pay a bonus pursuant to the Plan in exchange for the work that they would perform." *Id.* at ¶ 60; *see also id.* at ¶ 61 (claiming that there are "numerous and ongoing communications, written and oral, in which U.S. Steel promised bonus payments to non-union employees"); *id.* at

¶ 62 ("From 2005 and in years thereafter, U.S. Steel acknowledged in other documents given to non-union employees upon layoff that they would receive a prorated bonus for the year in which they were separated."); *id.* at ¶ 63 ("All documentation and copies of U.S. Steel's written communications to non-union employees relating to the Plan, and bonus payments generally, are in the possession of and known to U.S. Steel.").

According to Appellants, U.S. Steel's promises of bonuses, annual performance reviews, and consistent and ongoing bonus payments through the years reflected U.S. Steel's intent to pay a bonus to Appellants and other members of the putative class, and constituted an offer. *Id.* at ¶ 64. Appellants said that, through their work and performance in 2016, they accepted the offer. *Id.* at ¶ 69; *see also id.* at ¶ 70 ("A unilateral contract was created, which contract imposed upon U.S. Steel an obligation to pay the offered bonus to [Appellants] and other terminated employees … for work they performed in 2016.").

This Court has recognized implied, unilateral contracts in the employment context in the past. For instance, in *Bauer v. Pottsville Area Emergency Med. Servs., Inc.*, 758 A.2d 1265 (Pa. Super. 2000), the terms of an employee handbook provided that an employee working at least 36 hours per week for 90 days would be treated as a full-time employee. *Id.* at 1267. After meeting that requirement but not receiving full-time benefits, an employee complained to his employer and subsequently had his hours reduced to zero. *Id.* at 1267-68. The employee subsequently sued the employer for,

*inter alia*, breach of contract. **Id.** The employee argued that the employer breached the terms of the employee handbook, which he said were enforceable as provisions of an implied contract, by failing to promote him to the status of full-time employee. **Id.** The employer responded that its employee handbook specifically stated that it is an 'employer at will' and that it reserved the right to terminate employment at any time. **Id.** at 1268. The trial court sustained the employer's preliminary objections and dismissed the employee's complaint, determining that there was no contract upon which to base a cause of action because the employer evidenced its intent to maintain the at-will employment relationship. **Id.** at 1269.

On appeal, we reversed the trial court's decision with respect to the employee's breach of contract claim, explaining:

> A handbook is enforceable against an employer if a reasonable person in the employee's position would interpret its provisions as evidencing the employer's intent to supplant the at-will rule and be bound legally by its representations in the handbook. The handbook must contain a clear indication that the employer intended to overcome the at-will presumption. We have held that it is for the court to interpret the handbook to discern whether it contains evidence of the employer's intention to be bound legally.
>
> Provisions in a handbook or manual can constitute a unilateral offer of employment which the employee accepts by the continuing performance of his or her duties. A unilateral contract is a contract wherein one party makes a promissory offer which calls for the other party to accept by rendering a performance. In the employment context, the communication to employees of certain rights, policies and procedures may constitute an offer of an employment contract with those terms. The employee signifies acceptance of the terms and conditions by continuing to perform the duties of his or her job; no additional or special consideration is required.

- 12 -

*Id.* at 1269 (citations omitted).

Applying this law, we explained that "[n]othing in the handbook permits the assumption put forth by [the employee] that a contract of *permanent* or *full-time* employment was created when the minimum hours-days criteria of full employment were met[,]" and "[n]either does the provision permit [the employee] to presume that once the threshold was met and passed, there could be no reduction in hours, lessening or elimination of full-time status or ultimately termination at will." *Id.* at 1270 (emphasis in original). However, we concluded that, based upon the facts averred in the employee's complaint, the employee "may be entitled to the benefits applicable to a full-time employee for the period during which he fulfilled the terms of the employee handbook." *Id.* We observed that "a reasonable person in [the employee's] position would understand that his continued performance would bear the fruits of his employer's policies. [The employee] worked the requisite 36 hours per week for [a]n excess of 90 days and received none of the benefits provided for in the handbook." *Id.* at 1269.

Significantly, in the case *sub judice*, Appellants asserted that the 2015 Plan governed the bonus to be paid to them and the putative class. *See* Amended Complaint at ¶ 50 ("The 2015 Plan, a copy of which is attached as Exhibit B and incorporated herein by reference, governed the bonus to be paid to [Appellants] and all other members of the [putative c]lass."); Answer to New Matter at ¶ 101 ("Until the Plan was actually amended in 2016, non-represented employees of U.S. Steel, including members of the putative

[c]lass, worked under and were entitled to be paid their bonuses pursuant to the terms of the 2015 Plan.").[5]

Yet, even the 2015 Plan contained provisions indicating that U.S. Steel was not making a promise to Appellants to pay a bonus, that all reliance by any individual concerning the subject matter of the Plan must be based solely upon the provisions set forth in the Plan, and that U.S. Steel could amend or terminate the Plan, in whole or in part, including retroactively. The 2015 Plan stated, in relevant part:

1. **HISTORY AND PURPOSE**

[U.S. Steel] established the United States Steel Corporation Short-Term Incentive Plan for Non-Union Salaried Employees (the "Prior Plan"), effective as of January 1, 2005. [U.S. Steel] subsequently amended and restated the Prior Plan effective as of January 1, 2007, and as of the first day of each year thereafter, to incorporate new performance targets for the year and to make certain other changes. [U.S. Steel] hereby amends and restates the Prior Plan as the United States Steel Corporation Short-Term Incentive

---

[5] Appellants reiterate that the 2015 Plan governed multiple times on appeal. ***See also*** Appellants' Reply Brief at 18 ("Because the 2015 Plan had been adopted by U.S. Steel and unquestionably was in effect when [Appellants'] work was performed, the 2015 Plan can and should govern the question of bonus."); ***id.*** at 19 ("Indeed, if the 2015 Plan controls [Appellants'] claim to bonus, as [Appellants] rightfully contend, then U.S. Steel is obligated to satisfy their claim by paying the bonus."); ***id.*** at 20 ("The 2015 Plan is referenced specifically as expressing U.S. Steel's intent to pay a bonus to an entire group of non-union workers, thus creating an expectation of bonus among [Appellants] and the [putative c]lass. Section 6(A) of the 2015 Plan expressly and unequivocally awarded a bonus to [Appellants] and members of the [putative c]lass whose employment was terminated involuntarily by U.S. Steel.") (citations and footnote omitted); ***id.*** at 22 ("A jury could find that the 2015 Plan governs, and that [Appellants] are entitled to receive a bonus under that Plan.").

- 14 -

Plan (the "Plan" or "STIP"), effective January 1, 2015, as set forth herein.

The purpose of the Plan is to provide certain non-represented employees of [U.S. Steel] and its subsidiaries with an opportunity to earn an incentive award based upon the achievement of corporate, unit, and individual performance goals.

## 2. PLAN ADMINISTRATION, AMENDMENT AND TERMINATION

\*\*\*

(B) Plan Amendment and Termination- The Office of the CEO, in its sole discretion, may amend, suspend or terminate the Plan in whole or in part at any time, including retroactively if deemed necessary or appropriate. Without limiting the generality of the foregoing, the Office of the CEO may increase, reduce or eliminate any award determined pursuant to the formula in Section 4 and determine participation (including non-participation) on an individual and/or group basis at any time prior to actual payment, whether or not such determination is made before, during, or after the relevant Performance Period.

\*\*\*

## 3. PARTICIPATION AND PARTICIPANT RIGHTS

\*\*\*

(B) Participant Rights- This Plan does not constitute a promise by [U.S. Steel] to make any payments under it and no employee or other individual shall have any claim to be granted an award, or otherwise be entitled to payment, under the Plan. Nothing contained in the Plan nor payment of any award thereunder shall confer upon any employee or other individual any right to continue in the employ of [U.S. Steel], its subsidiaries or affiliates, or interfere in any way with the right of [U.S. Steel], its subsidiaries or affiliates to terminate an employee's employment at any time.

\*\*\*

## 7. MISCELLANEOUS

*** 

> (C) <u>Exclusive Provisions of the Plan</u>- The provisions contained herein constitute the complete and exclusive statement of the terms of the Plan. There are no written or oral representations, promises, statements or commitments, other than those expressly set forth herein, with respect to any payments under the Plan. All reliance by any individual concerning the subject matter of this Plan must be based solely upon the provisions set forth in this document.

2015 Plan at §§ 1, 2(B), 3(B), and 7(C).[6] Thus, even if Section 6(A) of the 2015 Plan qualified Appellants to receive a bonus payment for the months they worked in 2016, Sections 2(B) and 3(B) made clear that U.S. Steel did not promise to remit bonuses and that it could determine participation (including non-participation) on an individual and/or group basis at any time prior to actual payment, including after performance.[7]

_____

[6] Although not addressed by either party, Section 6(C) also provided:

> If payment of a Plan award is made pursuant to the provisions of this Section 6, the award shall be payable at the time specified in Section 5(A). Notwithstanding any other provisions of the Plan, Participants, their surviving spouses and estates shall have no vested right to any award prior to the payment date.

2015 Plan at § 6(C). **See also** 2015 Plan at § 5(A) ("Plan awards, if any, shall be paid in cash in a single sum no later than March 15th of the year following the year in which the Performance Period ends.").

[7] Appellants insist that the 2015 Plan is ambiguous, stating that Section 2(B) of the Plan cannot be reasonably interpreted to permit U.S. Steel to amend the Plan to deny Appellants the bonus promised to them in Section 6(A). Appellants' Reply Brief at 38-40; **see also id.** at 2-5. We disagree. While Section 6(A) permitted Appellants to receive a bonus for the months they worked in 2016, Section 2(B) nevertheless enabled U.S. Steel to determine participation (including non-participation) on an individual and/or group basis
*(Footnote Continued Next Page)*

Seemingly recognizing this difficulty, Appellants allege that U.S. Steel's course of conduct and outside representations — in conjunction with the 2015 Plan — created a unilateral, implied-in-fact contract. However, Appellants specifically alleged that the 2015 Plan governed, and Section 7(C) set forth that participants cannot rely on outside representations to impute an obligation to pay a bonus onto U.S. Steel. Appellants do not adequately explain why Section 7(C) in the purportedly governing 2015 Plan should be disregarded. **Commonwealth v. Hardy**, 918 A.2d 766, 771 (Pa. Super. 2007) ("[I]t is an appellant's duty to present arguments that are sufficiently developed for our review. … This Court will not act as counsel and will not

---

at any time prior to actual payment, and Section 3(B) declared that the Plan did not constitute a promise by U.S. Steel to make a payment under it. Reading the 2015 Plan as a whole, it is clear to us that Appellants were not promised a bonus and that U.S. Steel could amend the Plan after performance and prior to payment. **Cf. Lenau v. Co-eXprise, Inc.**, 102 A.3d 423, 430 (Pa. Super. 2014) ("[I]t is axiomatic that contractual clauses must be construed, whenever possible, in a manner that effectuates all of the clauses being considered. It is fundamental that one part of a contract cannot be so interpreted as to annul another part and that writings which comprise an agreement must be interpreted as a whole.") (citations omitted); **Carsone v. Carsone**, 688 A.2d 733, 735 (Pa. Super. 1997) ("When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. The court must construe the contract only as written and may not modify the plain meaning of the words under the guise of interpretation. When the terms of a written contract are clear, this Court will not re-write it to give it a construction in conflict with the accepted and plain meaning of the language used. [A] written contact must be construed as a whole and the parties' intentions must be ascertained from the entire instrument; effect must be given to each part of a contract.") (cleaned up).

develop arguments on behalf of an appellant.") (citations omitted).[8]

Furthermore, if the 2015 Plan governed, as Appellants repeatedly advance,

_____

[8] To support its argument that we should consider U.S. Steel's outside communications and course of conduct, Appellants cite to *Braun*, *supra*, a case where Wal-Mart employees sued Wal-Mart after they claimed they were not compensated for breaks as mandated by Wal-Mart's employee handbook and written policies. *Braun*, 24 A.3d at 883-86. Without conducting any analysis of the facts, Appellants simply state that "[i]n affirming a jury verdict in favor of Wal-Mart employees, this Court emphasized Wal-Mart's corporate policy set forth in its employee handbook regarding work breaks and Wal-Mart's communication of its intention to pay employees for time on break in finding that Wal-Mart's workers expected to be paid for the break time." Appellants' Reply Brief at 21-22 (emphasis in original). Based on our review of *Braun*, it does not appear that Wal-Mart's handbook or written policies contained any kind of exclusivity provision like Section 7(C). Further, to the extent Appellants cite *Braun* for the proposition that "even where workers are told that they will not be compensated for certain work performed, an implied unilateral contract still can entitle them to wages for the work[,]" *see* Appellants' Reply Brief at 21, it is unclear to us how the employees in that case were told they would not be compensated for their work. *See Braun*, 24 A.3d at 943 ("[The employees] claimed that Wal–Mart deprived the class of unpaid, thirty-minute meal-periods and paid, fifteen-minute rest-breaks pursuant to Wal–Mart's PD–07 policy and required its employees to work off the clock without compensation, in violation of PD–43. [The employees] claim they continued to work in reliance on the promise that these corporate policies would be enforced."); *id.* at 945 ("[T]he employee handbook contained Wal–Mart's policies regarding rest breaks, off-the-clock work and meal breaks, policies which were reinforced by Wal–Mart's corporate-wide policies and orientation sessions in which the handbook was disseminated and signed for by the hourly associates, resulting in a unilateral contract between Wal–Mart and the members of the class.") (citation omitted); *id.* at 946 ("The evidence presented at the time of trial by Wal–Mart and [the employees] shows that Wal–Mart violated its own corporate policies promising benefits to associates."). Thus, Appellants' undeveloped reliance on *Braun* is unconvincing here.

Additionally, to the extent Appellants also suggest that U.S. Steel's outside communications and course of conduct should be considered because the 2015 Plan is ambiguous, *see* Appellants' Reply Brief at 38-40, we reject that argument for the reasons already set forth *supra. See* footnote 7, *supra*.

they do not articulate why it would be reasonable for them to rely on outside representations and U.S. Steel's course of conduct to expect that they would be paid a prorated bonus for the months they worked in 2016, given the 2015 Plan's express provisions. **See id.**; **Bauer**, **supra**.

Appellants also argue that U.S. Steel could not eliminate the bonus after Appellants had rendered their performance. **See** Appellants' Reply Brief at 23-34. According to Appellants, under unilateral contract principles, a binding contract for payment of a bonus was formed by Appellants' completion of the work requested of them by U.S. Steel in 2016. **Id.** at 24 (citation omitted). They claim that "[t]he reserved power to amend, modify or terminate the Plan, or bonus payments under the Plan, does not entitle U.S. Steel to avoid its express and binding contractual obligation to pay [Appellants] their earned and vested bonus." **Id.** at 24-25 (citations omitted).

In response to Appellants' argument, assuming *arguendo* that U.S. Steel promised a bonus payment under the Plan to Appellants, U.S. Steel directs our attention to **Abbott v. Schnader, Harrison, Segal & Lewis, LLP**, 805 A.2d 547 (Pa. Super. 2002). In that case, this Court considered whether active partners in a law firm may amend a provision of a partnership agreement providing for income to retired partners, without the consent of the retired partners, where the amendment would substantially reduce the retired partners' income. **Id.** at 549. Importantly, the at-issue amendment provision in that case stated that a vote of 75% of the active partners could amend the agreement, but it did not specify that the partnership agreement

- 19 -

could be amended retroactively to reduce the retired partners' income. **See**

**id.** at 550, 557-58. In addressing the question, this Court looked to

**Kemmerer v. ICI Americas Inc.**, 70 F.3d 281 (3d Cir. 1995), explaining:

> In **Kemmerer**, that court interpreted a top hat plan[13] that permitted plan participants to elect a payment schedule by which they would receive their retirement benefits. The plaintiffs elected an extended payment schedule, and later retired. Following their retirement, the company unilaterally terminated the top hat plan and, against the plaintiffs' elections, paid the remaining amounts due in three annual installments. **Id.** at 285.
>
>> [13] "A top hat plan is a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly trained employees."
>
> The Third Circuit affirmed the trial court's conclusion that this more rapid payment schedule was a breach of the plan. Examining the contract as a whole, the court found that a unilateral contract was created which vested rights in those employees who accepted the offer it contained by continuing in the company's employment until retirement: "Under unilateral contract principles, once the employee performs, the offer becomes irrevocable, the contract is completed, and the employer is required to comply with its side of the bargain." **Id.** at 287. However, the company argued that the plan did not restrict its right to terminate, which was to be presumed, and so it could terminate the plan even after performance by the plaintiffs. The court rejected this argument, holding that "even when a plan reserves to the sponsor an explicit right to terminate the plan, acceptance by performance closes that door under unilateral contract principles (unless an explicit right to terminate or amend after the participants' performance is reserved)." **Id.** at 287–88. The court added that "any other interpretation ... would make the [p]lan's several specific and mandatory provisions ineffective, rendering the promises embodied therein completely illusory." **Id.** at 288…. The company's claim to an unfettered right to terminate in the face of specific grants of benefits "ha[d] no basis in contract law" and was "more than minimally unfair." **Id.** at 287.

Implicit in the ***Kemmerer*** decision was a recognition of the exceptional interpretation which the company asked to be given to the plan: that even *post-performance*, the company had a right to terminate the plan, *retroactively* invalidating rights it was reasonable for the employee to presume were fixed. As a subsequent case explained:

> The court's reasoning [in ***Kemmerer***] can be captured in a simple illustration. If an employee is promised $10 per hour effective Monday, and told that her wage can be reduced at any time, and on Wednesday her wage is cut to $5 effective Thursday, her employer cannot refuse on pay day to give her $10 per hour for her work on Monday through Wednesday. Far from requiring that the employer express an explicit intent to pay $10 per hour for Monday through Wednesday's work notwithstanding the employer's freedom to reduce wages at any time, the Third Circuit held that what would have to be preserved explicitly would be an employer's right to apply the reduced wage *retroactively* to Monday through Wednesday's work. A contrary rule would lack any basis in contract law and would render the employer's promise under the unilateral contract wholly illusory.

We find the ***Kemmerer*** approach to be a reasonable one and consistent with Pennsylvania law. ***See Kornstein [v. Taylor]***, 68 Pa. D. & C.2d [7,] 13 [(C.P. Philadelphia County), *aff'd without opinion*, 322 A.2d 369 (Pa. Super. 1974)] (amendment to partnership agreement denying plaintiffs partnership interest prior to dissolution ineffective where agreement did "not contain any provision giving the remaining partners the right to dissolve the partnership retroactively"); ***Levitt v. Billy Penn Corp.***, … 283 A.2d 873, 875 ([Pa. Super.] 1971) (rejecting argument that employee who resigned prior to retirement age lost pension rights because, *inter alia*, the terms of the plan did "not explicitly state that if an employee resigns from the company he has no rights under the plan"). This approach recognizes the reasonable expectation that contractual retirement benefits may not be abrogated after the performance which has triggered them, without an explicit reservation of the power to do so.

In light of the caselaw discussed above supporting the vesting of retirement benefits and our recognition of the exceptional nature of a power to retroactively amend retirement benefits expressed in ***Kemmerer***, we find [the retired partners'] construction of the

- 21 -

contract—that once they retired their rights vested and could not be reduced by amendment—to be reasonable. Further, in the context of the agreement as a whole and its amendment history, we conclude that [the retired partners'] interpretation is the *only* reasonable one.

*Id.* at 558-60 (some citations, footnotes, and quotation marks omitted; emphasis in original); *see also id.* at 561 (observing that "[i]t would have been a straightforward matter for the agreement to explicitly state that the retirement benefits provision could be amended to apply to a retired partner").

Here, the 2015 Plan set forth that "[t]he Office of the CEO, in its sole discretion, may amend, suspend or terminate the Plan in whole or in part at any time, ***including retroactively if deemed necessary or appropriate***[,]" and that "[w]ithout limiting the generality of the foregoing, the Office of the CEO may increase, reduce or eliminate any award determined pursuant to the formula in Section 4 and determine participation (including non-participation) on an individual and/or group basis ***at any time prior to actual payment, whether or not such determination is made before, during, or after the relevant Performance Period***." ***See*** 2015 Plan at § 2(B) (emphasis added); *see also id.* at § 6(C) (stating that, under Section 6, Participants "have no vested right to any award prior to the payment date").[9]

_____

[9] We find distinguishable ***Com. ex rel. Zimmerman v. Officers and Emp. Ret. Bd.***, 469 A.2d 141 (Pa. 1983) (*per curiam*), relied on by Appellants. In that case, our Supreme Court determined that the Public Employee Pension Forfeiture Act could not be applied retroactively to discontinue payment of a pension that vested ***prior to*** the passage of the Act. ***See id.*** at 142, 143 ("The complaint in mandamus called upon the court of common pleas to order [the retirement board] to discontinue payments of pension benefits to a
*(Footnote Continued Next Page)*

- 22 -

Accordingly, even if U.S. Steel had promised Appellants a bonus, given **Abbott** and the language in the 2015 Plan, we reject Appellants' argument that U.S. Steel could not eliminate the bonus after Appellants had rendered their performance.[10] Based on the foregoing, Appellants' breach of implied-in-fact contract claim fails as a matter of law.

_____

pensioner based upon the retroactive provision of section 7 which purported to extend the terms of the Forfeiture Act to December 1, 1972[,] although the effective date of the Forfeiture Act was July 8, 1978. It is that attempt to divest previously vested rights of a public employee or official by subsequent legislative judgment that we find to be a constitutionally impermissible retroactive divestment of vested rights. … From the date of the enactment of the Forfeiture Act[,] government employees are placed on notice that unfaithful service could jeopardize their pension rights and thus it serves as a deterrent to future misbehavior. However, the application to conduct prior to the enactment of the Forfeiture Act has no deterrent impact upon an employee who committed improper acts relating to the employment prior to that enactment, as was the case here."). Unlike the Act in **Zimmerman**, Appellants say that they worked under the 2015 Plan prior to their termination in 2016, and the 2015 Plan gave them notice that U.S. Steel could amend the Plan after performance and did not promise to pay a bonus. **See** Answer to New Matter at ¶ 101. Thus, we do not consider **Zimmerman** to be analogous.

[10] Appellants argue that U.S. Steel abused its discretion and acted in bad faith in amending the Plan and/or not paying them a bonus. Appellants' Reply Brief at 34-37; **see also id.** at 36 (stating that contracting parties must perform their contractual obligations in good faith). However, Appellants' argument overlooks that the express terms of the 2015 Plan forewarned that the Plan did not constitute a promise by U.S. Steel to pay a bonus and that U.S. Steel could "determine participation (including non-participation) on an individual and/or group basis at any time prior to actual payment, whether or not such determination is made before, during, or after the relevant Performance Period." 2015 Plan at § 2(B); **see also** Appellants' Reply Brief at 35 ("There is no law, or interpretation of the law, that would justify disparate and discriminatory treatment of [Appellants] and hundreds of other terminated employees by denying them the same bonus promised universally to all non-union employees for the work that all of them had performed, while honoring

*(Footnote Continued Next Page)*

- 23 -

## WPCL

Appellants alleged in their amended complaint that the bonus payments are protected under the WPCL, and that U.S. Steel violated the WPCL by not paying them the bonus. **See generally** Amended Complaint at ¶¶ 77-82. This claim also fails as a matter of law.

"[T]he WPCL provides employees a statutory remedy to recover wages and other benefits that are contractually due to them." **Braun**, 24 A.3d at 953 (cleaned up). "The WPCL does not create a statutory right to

---

the same commitment to their fellow employees, who had survived U.S. Steel's reduction in force."); **id.** ("U.S. Steel is not given *carte blanche* to amend the Plan, where the Plan, by its terms and the terms of all preceding Plans, may be interpreted to require the payment of benefits that have contractually vested or accrued.") (citation omitted). To the extent Appellants argue that contractual obligations must be performed in good faith, "[i]mplied duties cannot trump the express provisions in the contract." **Stamerro v. Stamerro**, 889 A.2d 1251, 1259 (Pa. Super. 2005) (citation omitted). The implied covenant of good faith is a principle for "courts to harmonize the reasonable expectations of the parties with the intent of the contractors and the terms in their contract." **Id.** (citation omitted). Here, U.S. Steel made clear in the 2015 Plan that it was not promising payment of a bonus and that the Plan could be amended after performance.

Additionally, to the extent Appellants question "whether the amendment of the Plan in October of 2016 was procedurally valid, *i.e.*, did the Office of the CEO decide on the amendment, as required by the Plan, and take proper action to adopt the amendment[,]" **see** Appellants' Reply Brief at 23 n.9, they do not point us to where they claimed the 2016 amendment was procedurally invalid in this way in their pleadings. **See** Answer to New Matter at ¶¶ 101-03 (claiming only that the 2016 Plan could not govern bonus payments earned before the amendment occurred, and that the 2015 Plan was amended belatedly and arbitrarily made retroactive). Further, notwithstanding the 2016 Plan, the **2015 Plan** permitted U.S. Steel to determine non-participation at any time prior to actual payment, including after performance, and declared that it did not constitute a promise by U.S. Steel to make a bonus payment.

compensation. Rather, it provides a statutory remedy when the employer breaches a contractual right to earned wages. Whether specific wages are due is determined by the terms of the contract." *Id.* at 957 (citations omitted).

Here, we have already determined that Appellants' breach of implied-in-fact contract claim fails as a matter of law. Consequently, Appellants' WPCL claim also fails as a matter of law, as Appellants have not proven that the bonus was contractually due to them.

**Promissory Estoppel**

In Appellants' amended complaint, they next asserted a claim for promissory estoppel. They alleged, *inter alia*, that Appellants and the putative class "performed their work for U.S. Steel in 2016 in response to and in reliance upon U.S. Steel's promise of bonus payments and historical practice of paying bonuses to them and other non-union employees throughout the years." Amended Complaint at ¶ 84. They claimed that they reasonably expected that U.S. Steel would pay the promised bonus, and that the work required of Appellants and the putative class in exchange for the promised bonus had been performed, and accepted by, U.S. Steel prior to the termination of their employment. *Id.* at ¶¶ 85-86. They said that U.S. Steel did not notify them that they would not be paid a bonus for work they had performed if they were terminated before the end of the year, thus inducing them to perform their work and satisfy the standards necessary to receive the bonus. *Id.* at ¶¶ 87-88. Appellants say they have been harmed by their good

faith reliance on U.S. Steel's promise of bonus payments and the unforeseen and unjustified repudiation of that promise. *Id.* at ¶ 90.

"Our Supreme Court has explained that the doctrine of promissory estoppel is invoked to avoid injustice by making enforceable a promise made by one party to the other when the promisee relies on the promise and therefore changes his own position to his own detriment." ***Erie Ins. Exch. v. United Servs. Auto. Ass'n***, 307 A.3d 1221, 1225 (Pa. Super. 2023) (*en banc*) (cleaned up). "A successful cause of action for promissory estoppel requires that the plaintiff plead and prove that: (1) the promisor made a promise that he should have reasonably expected to induce an action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can only be avoided by enforcing the promise." ***Id.*** (cleaned up).

As discussed *supra*, Appellants specifically said that the 2015 Plan governed the bonus to be paid to them. ***See*** Amended Complaint at ¶ 50; Answer to New Matter at ¶ 101. In the 2015 Plan, U.S. Steel stated that it was not promising to make payments pursuant to the Plan, and that all reliance by any individual concerning the subject matter of the Plan must be based solely upon the provisions set forth in the Plan. Appellants do not sufficiently explain how they can bring a claim for promissory estoppel where the 2015 Plan — which they averred governed — did not promise them a bonus and did not permit them to rely on representations outside of the Plan to impute a promise on U.S. Steel. ***See*** 'Breach of Implied-in-Fact Contract'

Section, *supra* (addressing why Section 6(A) of the 2015 Plan did not promise Appellants a bonus, and how Appellants have not supported why the exclusivity provision in Section 7(C) should be disregarded); *see also Hardy*, *supra*. As such, Appellants' promissory estoppel claim fails as a matter of law.

### Unjust Enrichment

Appellants' final claim is for unjust enrichment. In their amended complaint, they alleged that "[t]hrough their work for U.S. Steel in 2016, [Appellants] and the [putative c]lass earned their bonus payments, and were legally entitled to receive such payments." Amended Complaint at ¶ 93. They said that, "[b]y accepting the work, efforts and contributions of [Appellants] and the [putative c]lass, U.S. Steel was legally obligated to pay the promised bonuses to them." *Id.* at ¶ 94. They claimed that, "[i]n refusing to pay their 2016 bonuses to them, U.S. Steel has retained and benefited unjustly from the substantial moneys withheld from" Appellants and the putative class. *Id.* at ¶ 95.

"[W]here one party has been unjustly enriched at the expense of another, he is required to make restitution to the other. In order to recover, there must be both (1) an enrichment, and (2) an injustice resulting if recovery for the enrichment is denied." *Braun*, 24 A.3d at 896 (citations omitted). This Court has explained:

> The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such

circumstances that it would be inequitable for defendant to retain the benefit without payment of value. Whether the doctrine applies depends on the unique factual circumstances of each case. In determining if the doctrine applies, we focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.

Moreover, the most significant element of the doctrine is whether the enrichment of the defendant is *unjust*. The doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff.

*Id.* (citations omitted; emphasis in original). ***See also Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC***, 194 A.3d 1010, 1034 (Pa. 2018) ("Unjust enrichment is an equitable remedy, defined as the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected, and for which the beneficiary must make restitution.") (cleaned up).

This claim also fails as a matter of law. Here, Appellants said that U.S. Steel was legally obligated to pay the promised bonus to them after they performed the work, and that U.S. Steel was unjustly enriched by withholding the bonus payment from them. Again, however, Appellants claimed that the 2015 Plan governed. *See* Amended Complaint at ¶ 50; Answer to New Matter at ¶ 101. The 2015 Plan advised that U.S. Steel did not promise to pay Appellants a bonus, that U.S. Steel could determine participation (including non-participation) on an individual and/or group basis at any time prior to actual payment, including after performance, and that all reliance by any individual concerning the bonus must be based solely upon the provisions set forth in the 2015 Plan. Again, Appellants do not sufficiently articulate why

U.S. Steel was obligated to pay them a bonus and how they could have reasonably expected such payment given the terms of the allegedly governing 2015 Plan. *See* 'Breach of Implied-in-Fact Contract' Section, *supra* (addressing why Section 6(A) of the 2015 Plan did not promise Appellants a bonus, and how Appellants have not supported why the exclusivity provision in Section 7(C) should be disregarded); *see also Hardy*, *supra*. Thus, Appellants' unjust enrichment claim fails as a matter of law.

## Conclusion

For the above-stated reasons, Appellants' claims fail as a matter of law. Accordingly, we affirm the trial court's order granting U.S. Steel's motion for judgment on the pleadings.[11]

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/18/2025

---

[11] Due to our disposition, we do not address Appellants' issues pertaining to the Release or the other alternative argument advanced by U.S. Steel.